Mark MILLER and Cheryl Miller, Individually and Mark Miller as Administrator of the Estate of Matthew Miller, Deceased, Plaintiffs,

v.

PFIZER INC (ROERIG DIVISION), Defendant.

Civil Action No. 99–2326–KHV.

United States District Court, D. Kansas.

Feb. 11, 2002.

Ruth M. Benien, Benien Law Offices, Chtd., Kansas City, KS, Richard W. Ewing, Paul F. Waldner, Vickery & Waldner, Houston, TX, Arnold Anderson Vickery, Arnold Anderson Vickery, P.C., Houston, TX, for plaintiffs.

Patrick Lysaught, Baker, Sterchi, Cowden & Rice, L.L.C., Kansas City, MO, Robert J.E. Edwards, Polsinelli, Shalton & Welte, P.C., Kansas City, MO, James E. Hooper, Malcolm E. Wheeler, Amy L. Padden, Michael L. O'Donnell, Craig R. May, Wheeler Trigg & Kennedy, P.C., Denver, CO, for defendant.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Mark and Cheryl Miller claim that their 13-year-old son Matthew committed suicide because he took Zoloft—a prescription drug which Pfizer Inc. manufactured for treatment of depression. See Amended Complaint (Doc. # 92) filed December 16, 1999. The Millers seek to hold Pfizer liable for Matthew's wrongful death. Count I of their complaint alleges that Pfizer is strictly liable for marketing defects and misrepresentations about Zoloft. Count II alleges that Pfizer is liable under common law negligence theories for failing to test and warn about the dangers of drug-induced suicide. See Pretrial Order (Doc. # 171) filed March 6, 2000.

The matter comes before the Court on three motions for summary judgment: Defendant Pfizer Inc's Motion For Partial Summary Judgment On Plaintiffs' Claim Of Marketing Defect And Misrepresentation (Doc. # 505) and Defendant Pfizer Inc's Motion For Partial Summary Judgment On Plaintiffs' Failure To Warn Claim (Doc. # 504), both filed September 12, 2001, and Plaintiffs' Motion For Partial Summary Judgment (Doc. # 523) filed October 23, 2001. This matter also comes before the Court on Defendant Pfizer Inc.'s Motion In Limine No. 15 To Exclude References To Its Financial Condition And Announced Merger (Doc. # 276) filed April 28, 2000. The Court has carefully considered the parties' arguments and is now prepared to rule.

## Summary Judgment Standard

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1538-39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990); see also *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. *Applied Genetics*, 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment." *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. See *Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

### Statement Of Uncontroverted Facts

For purposes of summary judgment, the following facts are uncontroverted, deemed admitted, or, where disputed, viewed in the light most favorable to plaintiffs.[1]

● Matthew Miller

In the spring of 1997, staff members at Harmony Middle School (including teachers, school counselors and the school psychologist) were concerned about Matthew Miller.[2] Matthew had expressed suicidal ideation to both Roxanna Rogers, his special education classroom teacher, and his friends (Abby Meckna, Hillary Burton and Chad Brownell).[3] At least two students

---

**1.** Under D. Kan. Rule 56.1(b)(1), the party opposing facts "shall refer with particularity to those portions of the record upon which the opposing party relies." In opposing Pfizer's statement of material facts in this case, however, plaintiffs have not consistently cited portions of the record. See, e.g., Statement Regarding Uncontested Material Facts in Plaintiffs' Brief In Support Of Responses To Pfizer's Motion For Summary Judgment On Failure To Warn And Failure To Test Theories (Doc. # 342) filed May 12, 2000, and Plaintiffs' Brief In Support Of Responses to Pfizer's Motions For Summary Judgment On Failure To Warn, And Failure To Test Theories (Doc. # 515) filed October 3, 2001. Furthermore, many of plaintiffs' factual responses are misnumbered and do not even roughly correspond with the factual statement which they purport to controvert. Therefore the Court cannot understand plaintiffs' factual position. Under D. Kan. Rule 56.1(a), those material facts which plaintiffs have failed to adequately controvert are deemed admitted for purposes of summary judgment.

**2.** Roxana Rogers, a special education teacher, testified that Matthew's name had come up in discussions about students with behavioral problems at school. Deposition of Roxana Rogers (Exhibit I) at 12:11–15, 21:5–17. Elizabeth Price, another teacher, testified that at the end of the school year she was very concerned about Matthew. Deposition of Eliza-beth Price (Exhibit J) at 76:8–21. Price testified that Matthew could be mean to other classmates and sometimes isolated himself from other students. *Id.* at 24:5–24. Lisa Sonsthagen, a certified school psychologist, testified that during the school year Matthew's behavior grew more concerning. Deposition of Lisa Sonsthagen (Exhibit K) at 25:3–26. Becky Loomis, a school counselor, testified that she had increasing concerns about Matthew's academic progress, conduct, emotional state and behavior during the spring of 1997. Deposition of Becky Loomis (Exhibit L) at 14:2–7, 14:14–20. Robert Kreifels, school principal, testified that school officials became concerned about Matthew due to disciplinary issues and bullying behavior. Deposition of Robert Kreifels (Exhibit M) at 14:4–16:14.

All of the referenced depositions are contained in Appendix Vol.2 Defendant's Partial Summary Judgment On Plaintiffs' Failure To Warn Claim ("Def.'s Failure To Warn App., Vol 2") (Doc. # 225) filed April 18, 2000.

**3.** See Rogers Deposition (Exhibit I) at 88:17–89:7, 120:19–121:7, 186:9–21; Loomis Deposition (Exhibit L) at 24:1–25:1–7; Kriefels Deposition at 31:10–32:23; Deposition of Hilary Burton (Exhibit O) at 58:8–61:18; Deposition of Abby Meckna (Exhibit P) at 13:13–14:10, 27:3–31:6, 39:2–21, all in Def.'s Failure To Warn App., Vol 2 (Doc. # 225).

had told Ms. Rogers that Matthew had spoken of suicide. The staff therefore recommended that Matthew's parents seek professional evaluation and treatment for him, and that he see someone for counseling over the summer. Matthew's parents, Mark and Cheryl Miller, were also concerned. On June 30, 1997, they took Matthew to see Dr. Douglas Geenens, who was board certified in psychiatry by the American Board of Psychiatry and Neurology and board certified in child and adolescent psychiatry by the American Board of Psychiatry and Neurology. Dr. Geenens had done a residency in psychiatry at the Menninger Clinic and received further training in child psychiatry at Harvard Medical School. Eighty per cent of Dr. Geenens' practice involved the treatment of children and adolescents.

During Matthew's first visit, on June 30, 1997, Dr. Geenens diagnosed Matthew as suffering from "depression not otherwise specified."[4] Three weeks later, on July 21, 1997, Dr. Geenens saw Matthew a second time. At that time, based upon additional tests and further psychiatric evaluation, he concluded that Matthew was significantly depressed and prescribed Zoloft 50 mg. once a day.[5] At the time, Dr. Geenens warned Matthew and his parents that nausea and insomnia were common side effects of Zoloft, and told them to report any problems or anything unusual that happened while Matthew was taking Zoloft.[6] In allowing Matthew to use Zoloft, plaintiffs relied solely on Dr. Geenens' advice. In prescribing Zoloft, Dr. Geenens relied solely on his education, training, review of medical and scientific literature, the Physician's Desk Reference and his own clinical experience.[7] Dr.

4. Plaintiffs deny that Dr. Geenens told them of this diagnosis but they cite no record support for that contention, and they do not deny that Dr. Geenens made that diagnosis.

5. Plaintiffs claim that the test results were lost and that a jury may not believe that Dr. Geenens performed them. They cite no record evidence for this claim and the Court disregards it. Plaintiffs also claim that Dr. Geenens gave Matthew promotional samples of Zoloft which contained no package inserts. This purported fact is not contained in plaintiffs' statement of undisputed facts, either in support of their own motion or in opposition to Pfizer's motion. In the body of Plaintiffs' Brief In Support Of Response To Pfizer Motion For Summary Judgment On Marketing Misrepresentation ("Plaintiffs' Misrepresentation Response") (Doc. # 516) filed October 3, 2001, plaintiffs cite a portion of Mark Miller's deposition testimony to support their contention that the promotional samples did not have package inserts. See id. at 10 n. 2 (citing Exhibit 77 in Appendix Of Exhibits (Nos. 76 To 85) To Defendant Pfizer Inc.'s Pretrial Motions ("Def.'s Pretrial Ex. Nos. 76–85") (Doc. # 231) filed April 18, 2000 at 78–79). The cited pages support plaintiffs' contention that Dr. Geenens gave them promotional samples, but not that those samples did not con-

tain package inserts. The Court will therefore disregard that "fact."

6. Deposition of Douglas Geenens (Exhibit D) in Appendix Vol.1 Defendant's Partial Summary Judgment On Plaintiffs' Failure To Warn Claim ("Def.'s Failure To Warn App.", Vol 1") (Doc. # 225) filed April 18, 2000 at 123:18–125:8. Plaintiffs deny that Dr. Geenens told them to report "anything unusual" but they cite no record evidence in support of this denial and the Court disregards it.

7. See Geenens Affidavit (Exhibit F) in Appendix Defendant's Partial Summary Judgment On Plaintiffs' Claim Of Marketing Defect And Misrepresentation ("Pfizer's Marketing Defect Appendix") (Doc. # 212) filed April 18, 2000 at ¶ 2. Plaintiffs claim that in deciding to proscribe Zoloft, Dr. Geenens was heavily influenced by promotional activities by Pfizer. Specifically, plaintiffs argue that "[a]lthough Dr. Geenens may well think that he has not been influenced by Pfizer's subtle marketing maneuvers, . . . there is a evidence that Pfizer intended from the launch of Zoloft forward to influence physicians' prescribing practices in subtle ways which even they could not discern, . . . and (b) that their efforts succeeded with Douglas Geenens, D.O." Plaintiffs' Misrepresentation Response (Doc. # 516) at 5.

Geenens testified that he does not review pharmaceutical marketing materials and, when he receives marketing, advertising or promotional materials from pharmaceutical representatives, he throws them away without reading them.[8] He also testified that he did not read marketing, advertising or promotional materials about drugs in scientific and medical articles or journals.[9] Finally, Dr. Geenens testified that Pfizer sales representatives have never encouraged him to prescribe Zoloft in conditions which the FDA has not approved, and that he knows more about Zoloft than Pfizer sales representatives.

See *id.* at 59–60. In short, Dr. Geenens testified that Pfizer's marketing efforts had no effect on his decision to prescribe Zoloft for Matthew.[10]

At the time he prescribed Zoloft for Matthew, Dr. Geenens knew that published case reports and adverse event reports at the Food and Drug Administration ("FDA") had described instances in which patients who were undergoing treatment with antidepressants like Zoloft experienced suicidal ideation and committed suicide, or attempted to do so, while undergoing such treatment. In fact, Dr. Geenens was medically trained by Dr. Martin

In support of this argument, plaintiffs cite statements by James Lee Jung, the worldwide director of Pfizer's Central Nervous System division. Specifically, plaintiffs cite a speech which Jung gave to professional medical representatives (Pfizer employees who directly communicate drug information to physicians) when Pfizer launched its Zoloft product. Jung advised the representatives to communicate information about Zoloft to high-prescribing physicians and told them not to discuss suicide unless a physician asked about it. Jung told them that if asked, the representatives should say that Zoloft had a low risk of suicidal ideation. He did not want the representatives to bring up the topic because various reports had linked suicide with Prozac (an antidepressant which competed with Zoloft) and physicians could react negatively to an implicit comparison of the two drugs-feeling that Pfizer was unfairly taking advantage of the speculation about Prozac. See Deposition of James Lee Jung (Exhibit 36) in Index Of Plaintiffs' Consolidated Exhibits To Pretrial Motions, Vol. II ("Plaintiffs' Pretrial Ex., Vol. II") (Doc. # 369) filed May 12, 2000 at 91–92, 105–115; Jung Zoloft Launch Speech (Exhibit 48) in Plaintiffs' Pretrial Ex., Vol. II (Doc. # 369).

Unbeknownst to plaintiffs, Dr. Geenens had a pre-existing relationship with Pfizer. For two years, he had received compensation for his speech-making activities on behalf of Zoloft. Also, either shortly before or shortly after Matthew's death, Pfizer hired Dr. Geenens as a consultant to its Central Nervous System Division, which has primary responsibility for Zoloft. See Deposition of Douglas Geenens (Exhibit D) in Def.'s Failure To Warn App.,

Vol 1 (Doc. # 224) at 68, 128. Through the deposition testimony of Cheryl Miller, plaintiffs also imply that Dr. Geenens was biased. The Court is unclear, however, on what plaintiffs believe that Cheryl Miller's testimony proves. She testified that Dr. Geenens told her that "Zoloft was newer [than Prozac]" and "did not carry the baggage that Prozac had acquired." Cheryl Miller Deposition (Exhibit 70) in Pfizer's Pretrial Ex., Nos. 52–74 (Doc. # 230) at 232. Plaintiffs apparently believe that this evidence can defeat the "learned intermediary" doctrine as it is applied in Kansas. As discussed in the Court's analysis, however, such evidence does not raise a genuine issue of material fact whether, in ways he could not detect, subtle promotional activities by Pfizer caused Dr. Geenens to prescribe Zoloft for Matthew Miller on July 21, 1997.

**8.** See Geenens Deposition (Exhibit G) in Pfizer's Marketing Defect Appendix (Doc. # 212) at 79, 178:1–8.

**9.** See *id.* at 178–79.

**10.** See Geenens Affidavit (Exhibit F) in Pfizer's Marketing Defect Appendix at ¶¶ 2–3; see also Geenens Affidavit (Exhibit N) in Exhibits Vol. 2 Pfizer Inc.'s Opposition In Response To Plaintiffs' Motion For Partial Summary Judgment ("Pfizer's Opposition Ex., Vol. 2") (Doc. # 354b) filed May 12, 2000 at ¶ 9. Plaintiffs object to Dr. Geenens' "POST–DEPOSITION *EX PARTE* AFFIDAVIT," but cite no factual basis for their objection and no legal reason why the Court should not consider it.

Teicher, the principal author of anecdotal case reports which involved suicidal ideation of patients on Prozac, an antidepressant drug which is similar to Zoloft. In his opinion, however, Zoloft was a safe and effective medication for the treatment of depression.[11] In retrospect, even in the face of plaintiff's evidence Dr. Geenens would have given the Millers the same warning he gave them before concerning Zoloft.[12]

Plaintiffs did not contact Dr. Geenens about any side effects and to his knowledge, Matthew did not experience any clinically-significant side effects while he was taking Zoloft. Nonetheless, about six days after his second visit with Dr. Geenens, during the late night of July 27 or the early morning of July 28, 1997, Matthew died from asphyxiation.[13]

● Regulatory Approval Process For Zoloft

The Federal Food Drug and Cosmetic Act ("FDCA") requires that prescription medicines be approved as safe and effective before they may be sold.[14] The first step to obtain approval for a new prescription drug is to file an investigational new drug application ("IND").[15] An IND is filed with the Food and Drug Administration after animal and laboratory studies have been completed.[16] The IND describes in detail the product, the studies which have been performed, and a proposed plan for clinical trials with human volunteers.[17] If the FDA approves the IND, clinical trials may proceed.[18] If the

---

11. Plaintiffs claim that Dr. Geenens testified at his deposition that he would heed any warning from Pfizer. In doing so they misrepresent his actual testimony. Dr. Geenens testified that

Q. You would heed any warning that the drug manufacturer gave you about the risks of their drug, wouldn't you?
A. I would consider that in my clinical decision-making.
Q. Well, can you give me any circumstance in which you in your clinical decision-making would ignore a bold-faced warning in the package insert for a psychoactive drug?

. . . . .

A. Bold print black box is information that I would incorporate into my clinical decision-making.
Q. Dr. Geenens, I won't quibble with you. I just want to know if there is any circumstance you can envision where you would ignore or fail to heed a bold-faced warning about a drug?

. . . . .

A. I would do my best to heed that type of warning.
Geenens Deposition (Exhibit 1) in Index to Exhibits To Plaintiffs' Consolidated Statement Of Facts In Support Of Plaintiffs' Motion For Partial Summary Judgment, Vol. I ("Plaintiffs' Ex., Vol. I") (Doc. # 525) filed October 23, 2001 at 89–91. While this may show that

Dr. Geenens would incorporate the bold print black box warning into his decision-making, his testimony does not indicate that he would act solely based on that information. In addition, Dr. Geenens' testimony does not refer to a particular warning and on this record, it is insufficient to raise a genuine issue of material fact whether—had he received additional warnings from Pfizer—he would have opted not to prescribe Zoloft.

12. See Geenens Affidavit (Exhibit N) in Pfizer's Opposition Ex., Vol. 2 (Doc. # 354b) at ¶ 12.

13. For purposes of this order, the Court assumes that Matthew intended to commit suicide. This issue is contested but it is not material to the motions now pending.

14. See 21 U.S.C. § 355. A prescription medication is one which "is not safe for use except under the supervision of a practitioner licensed by law to administer such drugs." 21 U.S.C. § 353(b).

15. See 21 C.F.R. § 312.2.

16. See 21 C.F.R. §§ 312.20, 312.21.

17. See 21 C.F.R. § 312.21–312.22.

18. See 21 C.F.R. § 312.20.

clinical trials and other studies set forth in the IND are successfully completed, a new drug application ("NDA") may be filed with the FDA.[19] The NDA provides detailed safety and efficacy information about the medicine to the FDA.[20]

The FDA must reject a NDA for particular use if it "do[es] not include adequate tests by all methods reasonably applicable to show whether or not such drug is safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof; ... the results of such tests show that the drug is unsafe for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof; ... or ... [the] labeling is false or misleading in any particular."[21] To approve a new drug, the FDA must determine that it meets statutory standards for safety and effectiveness and labeling.[22] FDA standards provide that "[a] new drug may not be approved for marketing unless is has been shown to be safe and effective for its identified uses."[23]

On October 2, 1980, Pfizer filed an IND for sertraline for use in the treatment of depression. Sertraline is the generic name for Zoloft.[24] The FDA approved the IND, and physicians thereafter conducted clinical trials at 150 clinical centers over a period of several years. On April 13, 1988, Pfizer filed its NDA. The initial submission comprised 117 volumes of scientific information regarding the safety and efficacy of sertraline, as developed in laboratory and clinical testing programs.

The FDCA directs the FDA to establish expert panels "[f]or the purpose of providing expert scientific advice and recommendations ... regarding a clinical investigation of a drug or the approval for marketing of a drug."[25] The statute requires that such panels consist of:

(A) members who are qualified by training and expertise to evaluate the safety and effectiveness of the drugs to be referred to the panel and who, to the extent feasible, possess skill and expertise in the development, manufacture, or utilization of such drugs;

(B) members with diverse expertise in such fields as clinical and administrative medicine, pharmacy, pharmacology, pharmacoeconomics, biological and physical sciences, and other related professions;

(C) a representative of consumer interests, and a representative of interests of the drug manufacturing industry not directly affected by the matter to be brought before the panel; and

19. See 21 C.F.R. § 314.

20. See 21 C.F.R. § 314.50.

21. 21 U.S.C. § 355(d).

22. 21 U.S.C. § 355(d); see also 21 C.F.R. § 314.105(c).

23. 21 C.F.R. § 310.303(a). Plaintiffs cite testimony by Dr. Paul Leber, who served as Director of the FDA's Division of Neuropharmacological Drug Products and later became Commissioner of the FDA, for the proposition that FDA practice and standards for new drug approval are different from those stated in the governing statutes and regulations. Plaintiffs, however, do not provide a page cite for the comments within the 130 page document that allegedly supports this statement. See PDAC Meeting Transcript (Exhibit 14) Appendix Of Exhibits (Nos.1–25) To Defendant Pfizer Inc.'s Pretrial Motions ("Def.'s Pretrial Ex. Nos. 1–25") (Doc. # 228). The Court has nonetheless reviewed this document. Apparently plaintiffs are concerned about Dr. Leber's statement that the ideal is never attained in the real world of testing and that Pfizer's studies were "terrible." This does not mean, however, that the FDA would approve drugs that appeared unsafe and ineffective.

24. See Physician's Desk Reference (54th ed.2000) at 2399.

25. 21 U.S.C. § 355(n)(1).

(D) two or more members who are specialists or have other expertise in the particular disease or condition for which the drug under review is proposed to be indicated.[26]

On September 14, 1990, Pfizer submitted to the FDA a summary report of sertraline safety data for the Psychopharmacological Drugs Advisory Committee ("PDAC"), a summary report of sertraline clinical pharmacology, and a report on sertraline suicide attempts. Pfizer also submitted HAM–D Suicide Item No. 3, a portion of the Hamilton Depression Rating Scale which measured suicidal depression in the sertraline depression program, and a report on specific HAM–D scores in one clinical study of Zoloft. While the HAM–D has been found to be an insensitive barometer of treatment-emergent suicidal-ity, the data demonstrated that sertraline was more effective than placebo and comparable to active controls with respect to rates of suicide attempts and changes in the depression rating scale item that related to suicide. In particular, the data showed that suicide attempts occurred no more frequently in Zoloft patients (0.3%) than in placebo patients (0.3%).[27] These studies were not designed to detect or measure treatment-emergent suicidality.[28] The FDA reviewed the data from the HAM–D study, and in fact reported it in the Summary Basis of Approval when it later approved Pfizer's NDA for Zoloft.[29]

On November 19, 1990, the FDA convened the 33rd meeting of the PDAC for the sole purpose of reviewing Pfizer's NDA for Zoloft.[30] At the meeting, James F. Knudson, M.D. presented safety data

---

**26.** 21 U.S.C. § 355(n)(3).

**27.** *Id.*

**28.** In his article in 1991, Dr. J. John Mann, professor of Psychiatry at the University of Pittsburgh (now at Columbia University), recommended that instead of the single item HAM–D item 3 scale which Pfizer and Ely Lilly had used in clinical trials for Zoloft and Prozac, future clinical trials or tests employ the more refined Beck's suicidal ideation scale to measure treatment emergent suicidality. See Mann Deposition (Exhibit 3) in Plaintiffs' Ex., Vol. I (Doc. # 525) at 70–71, 80–81. At his deposition Dr. Mann explained that in a sufficiently large sample, the HAM–D item 3 scale is a simpler, less expensive instrument which is sufficient to detect any causal effect between drug therapy and attempted or completed suicides. He explained that in tests which involve fewer subjects, a more sensitive instrument is needed to give an answer that is statistically meaningful, and that this may be accomplished by a more sensitive measurement of suicidal *ideation*— Beck's suicidal ideation scale. Other researchers have opined that the HAM–D is insufficient. See Jonathan Cole Declaration (Exhibit 3) in Plaintiffs' Pretrial Ex., Vol. I (Doc. # 368) at 4; David Healy Declaration (Exhibit 2) in *id.* at ¶ 45 (FDA database of clinical trials is "sadly unreliable"). Pfizer representatives, however, consider the HAM–D scale "an excellent scale." Pfizer does not use the Beck scale to measure suicidal ideation. Harrison Deposition (Exhibit 18) in Plaintiffs' Ex., Vol. I (Doc. # 525) at 61:23–62:4. Even Dr. Mann admitted that the HAM–D has value and that "[y]ou can always come up with a better measure." Mann Deposition (Exhibit 3) in *id.* at 143–44.

**29.** See Summary Basis of Approval (Exhibit EE) in Appendix Vol.3 Defendant's Partial Summary Judgment On Plaintiffs' Failure To Warn Claim ("Def.'s Failure To Warn App., Vol 3") (Doc. # 226) at 38–39.

**30.** Participants in the meeting included PDAC Chairman Daniel E. Casey, M.D., a psychiatrist on staff at Portland Veterans Administration Medical Center and Oregon Health Sciences University; representatives of the FDA Neuropharmacological Drugs Division (Paul Leber, M.D. and Thomas P. Laughren, M.D.); Dr. Robert F. Prien, Director of Clinical Psychopharmacology at the National Institute of Mental Health; Dr. Robert M. Hammer, professor of psychiatry and statistics at the Medical College of Virginia; Carol A. Tamminga, M.D., professor of psychiatry at the University of Maryland; Dr. Linda F. Hezel, professor of nursing at the University of Missouri in Kansas City; Jeffrey A. Lieberman, M.D. of Long Island Jewish Medical Center and Albert Ein-

(including suicide attempts during clinical studies for Zoloft) on behalf of the FDA. In doing so, he noted that "disproportionate numbers of suicide attempts do not occur among the 3 treatment groups [Zoloft, placebo and active control]," and that "all suicide attempts appeared in depressed patients, none in the obese [a separate patient population in which Zoloft had been studied]." [31]

At the conclusion of the PDAC meeting, the Committee determined (by a vote of six to one) that there was sufficient evidence that sertraline was effective for the treatment of depression. It also determined (unanimously) that there was sufficient evidence that sertraline was safe for the treatment of depression.[32] At the meeting, however, Dr. Thomas Laughren (a senior FDA official) cautioned that "[w]e have no data for this drug in children. . . . I think it is important to point out that depression is an entity that exists in children and if this drug were to be approved, it is likely that some clinicians will want to use this drug in children." [33]

By letter dated September 30, 1991, the FDA informed Pfizer that Zoloft was "approvable." A determination that a medication is "approvable" means that the FDA will approve the application if specific additional information material is submitted or specific conditions are met.[34] To its letter, the FDA attached a proposal for Zoloft labeling, stating "[w]e believe it presents a fair summary of the information available on the benefits and risks of sertraline." [35] The proposed labeling included the following precaution regarding the risk of suicide in patients undergoing Zoloft therapy:

> Suicide—The possibility of a suicide attempt is inherent in depression and may persist until significant remission occurs. Close supervision of high risk patients should accompany initial drug therapy. Prescriptions for Zoloft (sertraline) should be written for the smallest quantity of capsules consistent with good patient management, in order to reduce the risk of overdose.

The FDA's proposed label also included the following statement under the "adverse reactions" heading:

> Psychiatric Disorders—Infrequent: abnormal dreams, aggressive reaction, amnesia, apathy, delusion, depersonalization, depression, aggravated depression, emotional lability, euphoria, hallucination, neurosis, paranoid reaction, suicide attempt, teeth-grinding, abnormal thinking; Rare: hysteria, somnambulism, withdrawal symptom.

On October 30, 1991, Pfizer responded to the FDA with a suggestion that the word "capsules" be changed to "tablets," and that the "Psychiatric" subsection of the "Adverse Reactions" section be revised to include suicide "ideation" in addition to suicide "attempt." [36] Pfizer did not propose other changes to the suicide warning.

stein College of Medicine; John M. Davis, M.D. of the Illinois State Psychiatric Institute; and Javier I. Escobar, M.D., professor of psychiatry at the University of Connecticut. At the meeting, various FDA representatives, including Dr. J. Hillary Lee, Dr. Ed Nevius, Dr. Japobrata Choudhury and James F. Knudson, M.D. presented safety and efficacy data. On behalf of Pfizer, Steven Ryder, M.D., presented scientific data on safety, efficacy and clinical pharmacology.

**31.** PDAC Transcript (Exhibit 14) in Pfizer's Pretrial Ex. Nos. 1–25 (Doc. #228) at 30.

**32.** *Id.* at 116–17.

**33.** *Id.* at 62.

**34.** 21 C.F.R. § 314.3(b).

**35.** See FDA Letter (Exhibit U) in Def.'s Failure To Warn App., Vol. 2 (Doc. #225).

**36.** CSO Labeling Review (Exhibit JJ) in Appendix Vol.4 Defendant's Partial Summary Judgment On Plaintiffs' Failure To Warn Claim ("Def.'s Failure To Warn App., Vol 4") (Doc. #227) filed April 18, 2000 at 1, 3–4.

On December 6, 1991, the FDA completed its review of the proposed package insert which would contain the Zoloft labeling and it accepted Pfizer's recommendations.

By letter dated December 30, 1991, the FDA approved Pfizer's NDA for Zoloft. In doing so it stated:

> We have completed our review of this application, as amended, and have concluded that adequate information has been presented to demonstrate that the drug product is safe and effective for use as recommended in the draft labeling dated October 30, 1991, as revised below. Additionally, we refer to the December 5, 1991, teleconference between staff from FDA and Pfizer during which agreement was reached on final labeling revisions. Accordingly, the application, with these labeling revisions, is approved, effective as of the date of this letter.[37]

The FDA also stated: "These revisions [to the label] are terms of the NDA approval. Marketing the product before making the agreed upon revisions in the product's labeling may render the product misbranded and an unapproved new drug." [38]

The FDA has never approved Zoloft for treatment of pediatric depression. At the same time, the FDA specifically permits doctors to prescribe drugs for off-label uses, i.e. uses for which they have not been approved.[39] At his deposition, Dr. Geenens testified that "[i]n child psychiatry we prescribe outside of FDA indication 99 percent of the time. It is the standard of care to utilize psychiatric medication in children and extrapolate from adult literature." [40] Indeed, the FDA's approval letter of December 30, 1991 recommended that Pfizer conduct studies with depressed children and adolescents, stating that "[d]epression is common among these populations and it is likely the sertraline will be used in children and adolescents, despite the absence of any relevant data." [41]

- Warnings

Throughout the time that Pfizer has marketed Zoloft in the United States, Zoloft prescriptions have included a package insert which lists "Precautions" and "Adverse Reactions." This package insert is reproduced in the Physician's Desk Reference. Both the package insert and the PDR list precautions and clinical trial data on the risk of patients developing treatment-emergent suicidality, mania or hypomania, anxiety, nervousness, agita-

---

**37.** See Temple Letter (Exhibit V) in Def.'s Failure To Warn App., Vol. 2 (Doc. # 225).

**38.** *Id.* Since 1992, the FDA has authorized Pfizer to market Zoloft not just for treatment of depression but also for treatment of obsessive compulsive disorder, pediatric obsessive compulsive disorder, panic and post-traumatic stress disorder. On each occasion, the FDA found that Zoloft was safe and effective for the additional use. In the approval process for each such indication, the FDA reviewed the Zoloft package insert, made changes to it, and approved it with indicated changes.

**39.** 21 U.S.C. § 396 provides that "[n]othing in this chapter shall be construed to limit or

interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship." See, e.g., *Samarah v. Danek Med., Inc.,* 70 F.Supp.2d 1196, 1209 n. 7 (D.Kan.1999) (citing *Ortho Pharm. Corp. v. Cosprophar, Inc.,* 32 F.3d 690, 692 (2d Cir.1994)).

**40.** Geenens Deposition (Exhibit D) in Def.'s Failure To Warn App., Vol. 1 (Doc. # 224) at 58:24–59:3.

**41.** Temple Letter (Exhibit V) in Def.'s Failure To Warn App., Vol. 2 (Doc. # 225).

tion, hyperkinesia, insomnia, apathy, emotional lability and other potential adverse events. The package insert and PDR with regard to suicide have not changed, and the warnings which were in effect in July 1997 (at the time of Matthew's death) specifically noted: "Pediatric Use—Safety and effectiveness in children have not been established."

The package insert states in relevant part as follows:

PRECAUTIONS

General

Activation of Mania/Hypomania—During premarketing testing, hypomania or mania occurred in approximately 0.4% of ZOLOFT (sertraline hydrochloride) treated patients. Activation of mania/hypomania has also been reported in a small proportion of patients with Major Affective Disorder treated with other marketed antidepressants. * * *

Suicide—The possibility of a suicide attempt is inherent in depression and may persist until significant remission occurs. Close supervision of high risk patients should accompany initial drug therapy. Prescriptions for ZOLOFT should be written for the smallest quantity of tablets consistent with good patient management, in order to reduce the risk of overdose. * * *

ADVERSE REACTIONS

Commonly Observed—The most commonly observed adverse events associated with the use of ZOLOFT (sertraline hydrochloride) and not seen at an equivalent incidence among placebo treated patients were: gastrointestinal complaints, including nausea, diarrhea/loose stools and dyspepsia; tremor; dizziness; insomnia; somnolence; increased sweating; dry mouth; and male sexual dysfunction (primarily ejaculatory delay).

Associated with Discontinuation of Treatment—Fifteen percent of 2710 subjects who received ZOLOFT in pre-marketing multiple dose clinical trials discontinued treatment due to an adverse event. The more common events (reported by at least 1% of subjects) associated with discontinuation included agitation, insomnia, male sexual dysfunction (primarily ejaculatory delay), somnolence, dizziness, headache, tremor, anorexia, diarrhea/loose stools, nausea, and fatigue.

Incidence in Controlled Clinical Trials— The table that follows enumerates adverse events that occurred at a frequency of 1% or more among ZOLOFT patients who participated in controlled trials comparing titrated ZOLOFT with placebo. Most patients received doses of 50 to 200 mg per day. The prescribed should be aware that these figures cannot be used to predict the incidence of side effects in the course of usual medical practice where patient characteristics and other factors differ from those which prevailed in the clinical trials. Similarly, the cited frequencies cannot be compared with figures obtained from other clinical investigations involving different treatments, uses, and investigators. The cited figures, however, do provide the prescribing physician with some basis for estimating the relative contribution of drug and non-drug factors to the side effect incidence rate in the population studied.

**Treatment–Emergent Adverse Experience Incidence in Placebo–Controlled Clinical Trials**

Adverse Experience (Percent of Patients Reporting)

ZOLOFT Placebo

(N=861) (N=853)

 * * * * * *

Centr. & Periph. Nerv. System Disorders

Headache 20.3 19.0

Dizziness 11.7 6.7

Tremor 10.7 2.7

Parethesia 2.0 1.8

Hypoesthesia 1.7 0.6

Twitching 1.4 0.1

Hypertonia 1.3 0.4

\* \* \* \* \* \*

Psychiatric Disorders

Insomnia 16.4 8.8

Sexual Dysfunction Male 15.5 2.2

Somnolence 13.4 5.9

Agitation 5.6 4.0

Nervousness 3.4 1.9

Anxiety 2.6 1.3

Yawning 1.9 0.2

Sexual Dysfunction Female 1.7 0.2

Concentration Impaired 1.3 0.5

\* \* \* \* \* \*

Other Events Observed During the Pre-marketing Evaluation of Zoloft (sertraline hydrochloride): During its pre-marketing assessment, multiple doses of ZOLOFT were administered to approximately 2700 subjects. The conditions and duration of exposure to ZOLOFT varied greatly, and included (in overlapping categories) clinical pharmacology studies, open and double-blind studies, uncontrolled and controlled studies, inpatient and outpatient studies, fixed-dose and titration studies, and studies for indications other than depression. Untoward events associated with this exposure were recorded by clinical investigators using terminology of their own choosing. Consequently, it is not possible to provide a meaningful estimate of the proportion of individuals experiencing adverse events without first grouping similar types of untoward events into a smaller number of standardized event categories.

In the tabulations that follow, a World Health Organization dictionary of terminology has been used to classify reported adverse events. The frequencies reported, therefore, represent the proportion of the approximately 2700 individuals exposed to multiple doses of ZOLOFT who experienced an event of the type cited on at least one occasion while receiving ZOLOFT. All events are included except those already listed in the previous table and those reported in terms so general as to be uninformative. It is important to emphasize that although the events reported occurred during treatment with ZOLOFT, they were not necessarily caused by it. Events are further categorized by body system and listed in order of decreasing frequency according to the following definitions: frequent adverse events are those occurring on one or more occasions in at least 1/100 patients (only those not already listed in the tabulated results from placebo controlled trials appear in this listing); infrequent adverse events are those occurring in 1/100 to 1/1000 patients; rare events are those occurring in fewer than 1/1000 patients. Events of major clinical importance are also described in the PRECAUTIONS section. \* \* \*

Central and Peripheral Nervous System Disorders—*Frequent:* confusion; *Infrequent:* ataxia, abnormal coordination, abnormal gait, hyperesthesia, hyperkinesia, hypokinesia. migraine, nystagmus, vertigo; *Rare:* local anesthesia, coma, convulsions, dyskinesia, dysphonia, hyporeflexia, hypotonia, ptosis. \* \* \*

Psychiatric Disorders—*Infrequent:* abnormal dreams, aggressive reaction, amnesia, apathy, delusion, depersonalization, depression, aggravated depression, emotional lability, euphoria, hallucination, neurosis, paranoid reaction, suicide ideation and attempt, teeth-grinding, abnormal thinking; *Rare:* hysteria, somnambulism, withdrawal syndrome.

According to the dictionary of the World Health Organization ("WHO"), "hyperkinesia" is the preferred term for akathisia.

At the time Pfizer issued the package insert warnings, they complied with FDA

regulatory standards, and the FDA mandated and approved them.[42] Under 21 C.F.R. § 201.57(e), however, "the labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug," and a causal relationship need not have been proved.[43]

● Association Between Zoloft And Suicide[44]

When it approved the NDA for Zoloft for treatment of depression, the FDA issued a 60–page report, entitled "Summary Basis of Approval," which summarized the reasons and clinical data which supported its conclusion that Zoloft was safe and effective.[45] The FDA specifically addressed suicidality in section 5.2.2.4.1, stating:

> In the sertraline development program there were 9 suicide attempts in the sertraline group, 5 in the placebo group, and 1 in the active control group: all of these suicide attempts were in therapeutic depression studies. Two of the suicide attempts in the sertraline group resulted in completed suicides. The incidence rates by treatment group for suicide attempts, corrected for differential therapy duration, were 1.77 per 100 patient years (95% confidence limits 0.8–3.4) for the sertraline group, 2.39 (95% C.L. 0.7–5.5) in the placebo group, and 1.10 (95% C.L. 0.0–6.2) in the active control group. The incidence rates of suicide attempts were thus generally similar in the 3 treatment groups, with broadly overlapping 95% confidence limits. . . .

Review of the rates of events defined by baseline to endpoint shifts in HAM–D Item 3 scores [i.e., measurement of suicidal ideation] and baseline to endpoint changes in HAM–D Item 3 scores showed results favoring sertraline over placebo and supported the comparability of the sertraline

**42.** See Temple Letter (Exhibit V) in Def.'s Failure To Warn App., Vol. 2 (Doc. # 225); see also Leber Letter (Exhibit KK), Leber Letter (Exhibit LL), David Facsimile (Exhibit MM), Katz Letter (Exhibit NN), all in Def.'s Failure To Warn App., Vol. 4 (Doc. # 227).

**43.** During the comment period on a new FDA labeling format, the FDA Commissioner stated that:

> ... these labeling requirements do not prohibit a manufacturer, packer, relabeler, or distributor from warning health care professionals whenever possibly harmful adverse effects associated with the use of the drug are discovered. The addition to labeling and advertising of additional warnings, as well as contraindications, adverse reactions, and precautions regarding the drugs, or the issuance of letters directed to health care professionals (e.g. 'Dear Doctor' letters containing such information) is not prohibited by these regulations.

Labeling And Prescription Drug Advertising: Content And Format For Labeling for Human Consumption, 44 Fed.Reg. 37,434 (June 26, 1979) (Exhibit 51) in Plaintiffs' Pretrial Ex., Vol. II (Doc. # 369) at 37,447. Apparently the Commissioner (the record does not reveal who was commissioner at this time) was responding to these concerns after the FDA decided to adopt labeling standards.

**44.** In addition to the evidence discussed in this section, plaintiffs attempt to demonstrate an association between SSRI drugs and akathisia, and akathisia and suicide by citing The PDR Family Guide To Prescription Drugs (Exhibit 57), Prozac and Other Psychiatric Drugs, Everything You Need To Know by Dr. Lewis Opler (Pocket Books, 1996) (Exhibit 125), and Clinician's Handbook of Prescription Drugs by Sr. Seymour Ehrenpreis (2001) (Exhibit 139), all in Plaintiffs' Ex., Vol. IV (Doc. # 528). The Court has already sustained Pfizer's motion in limine as to The PDR Family Guide, and excluded it from evidence. Neither of the remaining books are listed on plaintiffs' exhibit list, relied upon by experts or shown to be admissible in evidence. The Court therefore disregards them as well.

**45.** See Summary Basis of Approval (Exhibit EE) in Def.'s Failure To Warn App., Vol. 3 (Doc. # 226) at 38–39.

and active control groups with respect to suicidality in therapeutic depression trials.

According to Dr. Jonathan Cole, who gave deposition testimony in this case, such after-the-fact meta-analyses of clinical trial data are not designed to detect or measure treatment emergent suicidality.[46] Zoloft is a selective serotonin reuptake inhibitor ("SSRI") drug.[47] In the early 1990s, several medical and lay media reports suggested that Prozac—another SSRI drug (generally known as fluoxetine)—caused violent and suicidal activity. In particular, in February of 1990, psychiatrists Martin Teicher, M.D., Ph.D. and Jonathan Cole, M.D. (with nurse Carol Glod, R.N., M.S.C.S.) published an article which described six patients who reported suicidal ideation while undergoing treatment with Prozac and other medications.[48] The article theorized that their suicidal ideation was a paradoxical response to Prozac. After this article was published, the question whether SSRI antidepressants cause suicidal ideation or activity came to the forefront of public consciousness in the United States. This article, and the controversy which it created, engendered FDA regulatory action and captured the attention of the popular media. Initially this controversy was principally focused on Prozac—the only SSRI drug on the United States market at that time.

On October 10, 1990, the Citizens Commission on Human Rights, a group established by the Church of Scientology, petitioned the FDA to withdraw its approval of Prozac. On August 1, 1991, after reviewing the Scientology Petition and all available evidence, the FDA found that "[t]he data and information available at this time do not indicate that Prozac causes suicidality or violent behavior." Peck Letter (Exhibit X) in Def.'s Failure To Warn Ex., Vol. 2 (Doc. # 225). Accordingly, it denied the petition.[49]

**46.** See, e.g., Cole Declaration (Exhibit 3) in Plaintiffs' Pretrial Ex., Vol. I (Doc. # 368) at 4.

**47.** See The Merck Manual of Diagnosis and Therapy (17th ed.1999) at 1533–34.

**48.** See Emergence Of Intense Suicidal Preoccupation During Fluoxetine Treatment, Am. J. Psychiatry 207–210 (Feb.1990). Dr. Cole is an older physician; at one time (probably at least through 2000), he was considered a thought leader in psychopharmacology. According to Dr. Mann and Dr. Casey, Dr. Teicher is a pioneer in the field of psychopharmacology.

**49.** That same day, the American Psychiatric Association issued the following statement: The Food and Drug Administration has chosen science over sensationalism by rejecting the petition of the Scientology-backed Citizens Commission on Human Rights to remove the antidepressant medicine Prozac from the market. The American Psychiatric Association applauds the FDA decision.... Like all prescription medicines, Prozac has some side effects. But it is depression, the illness, which kills by causing suicide in as many as one in six patients with major depression who are not being treated.... Psychiatrists and other physicians have known since medical school that treatment for depression, whether with anti-depressants or psychotherapy, may lead to an increase in energy before it eliminates the suicidal thoughts. Psychiatrists routinely alert patients and their families to this possibility, and urge them to contact their physician whenever they experience suicidal thoughts. Statement by American Psychiatric Association on Aug. 1, 1991 (Exhibit QQ); see also News Release On Sept. 21, 1991 (Exhibit RR), both in Def.'s Failure To Warn App., Vol. 2 (Doc. # 227). The most recent textbook by the American Psychiatric Association indicates that in approximately six per cent of the population, individuals who are treated with antidepressants will experience the appearance or worsening of suicidal behavior. Textbook Of Psychiatry (3rd ed.1999) at 1398. It notes that Dr. Teicher and colleagues reported in 1990 that six depressed patients taking fluoxetine (Prozac) became intensely preoccupied with suicidal ideation and that fluoxetine-induced akathisia was implicated in several of those cases, on the basis of both the phenomenology

On May 23, 1991, Public Citizen, another group, petitioned the FDA to mandate a "black box" warning discussing the alleged causal connection between Prozac and suicide.[50] Four months later, on September 20, 1991, the FDA convened the 34th meeting of the PDAC to investigate the possibility that antidepressant drugs caused suicidal acts and thoughts, or other violent behavior.[51] As part of its meeting, the PDAC conducted a public hearing which lasted about four hours. After the hearing, the committee heard presentations from Eli Lilly which manufactures Prozac and FDA personnel. Upon reviewing the evidence, the PDAC unanimously concluded that there was no credible evidence of a causal relationship between antidepressant drugs and the emergence and/or intensification of suicidality or other violent behav-

of the symptom and a positive response to antiakathisia treatments. Other cases of increased suicidality were attributed to a well-known condition among severely depressed patients initiating treatment with antidepressants: relief from dysphoria may lag behind while energy levels begin to increase, with the result that the patients' motivation to complete suicide is greater than it was before treatment. The textbook concludes, however, that "[w]hatever the explanation," studies of suicide rates among fluoxetine users have not indicated an increased risk of suicide attempts or completions, relative to users of other antidepressants; in fact, it notes that larger controlled studies have confirmed that suicide rates among depressed patients treated with fluoxetine (and all other antidepressants) are markedly reduced from those of depressed patients who do not receive antidepressants. See Excerpt from Textbook of Psychiatry (3d ed. 1999) (Exhibit 27) in Plaintiffs' Pretrial Ex. Vol. I (Doc. # 368) at 1038–39, 1398–99.

**50.** See Peck Letter (Exhibit AA) in Def.'s Failure To Warn App., Vol. 2 (Doc. # 225).

**51.** The FDA requested the committee's advice on the following:

(i) Is there credible evidence to support a conclusion that antidepressant drugs cause the emergence and/or intensification of suicidality and/or other violent behaviors?

(ii) If so, does the evidence indicate that a particular drug or drug class pose a greater risk than others?

(iii) If the whole class or a particular drug cause emergence and/or intensification of suicidality, what actions, if any, should the Agency take?

(iv) Even in the absence of sufficient evidence to establish causation, do the large volume of reports and/or the type of reports received justify some Agency action, e.g., a modification of labeling for some or all antidepressants?

Letter From M. Bernstein, M.D. To PDAC Members (Exhibit PP) in Def.'s Failure To Warn App., Vol. 4 (Doc. # 227).

Dr. Casey again chaired the committee, which included four members of the 33rd PDAC, which had reviewed Pfizer's NDA for Zoloft (Dr. Lieberman, Dr. Hammer, Dr. Tamminga and Dr. Escobar). New PDAC members included James Claghorn, M.D. of Clinical Research Associates; David Dunner, M.D., professor in the Department of Psychiatry, University of Washington; Keh Ming Lin, M.D., Director of Research on the Psychobiology of Ethnicity at the UCLA Medical Center; Regina Casper, M.D., professor of Psychiatry at the University of Chicago; and Nina Schooler, Ph.D., director of the Psychosis Research Program, Western Psychiatry Institute and Clinic, University of Pittsburgh. Consultants to the committee included Dr. Martin Teicher, whose case reports had given rise to the theory that Prozac caused suicidal behavior; Ida Hellander, M.D., one of the individuals who had signed the Public Citizen Petition; J. John Mann, M.D., professor of Psychiatry at the University of Pittsburgh (now at Columbia University); Stewart Montgomery, M.D., member of the Academic Department of Psychiatry of St. Mary's Hospital; Darrel A. Reiger, M.D., Director of the Division of Clinical Research, National Institute of Mental Health; and Michael Stanley, Ph.D. of Columbia University College of Physicians and Surgeons. Various FDA members (Michael Bernstein, M.P.H., Paul Leber, M.D., Robert Temple, M.D., Thomas Laughren, M.D. and Bruce Stadel, M.D.) also attended and participated. See Bernstein Letter To PDAC Members (Exhibit PP) in Def.'s Failure To Warn Ex., Vol 4 (Doc. # 227).

ior.[52] The PDAC voted (by a 6 to 3 vote) against recommending any change to package inserts for SSRI drugs.[53] In that regard, Dr. Leber, Director of the FDA Division of Neuropharmacological Drug Products (later FDA Commissioner), stated that a change in antidepressant labeling might have a "net effect [of] a reduction in the use of antidepressants in the treatment of depression, and that result might cause overall injury to the public health." [54]

Upon reviewing the PDAC report, the FDA determined that while there was no reasonable evidence of a causal relationship between Prozac and suicide, more testing was appropriate.[55]

At about the same time, in November of 1991, Dr. J. John Mann, an eminent suicidologist and psychopharmacologist, published an article entitled Emergence Of Suicidal Ideation And Behavior During Antidepressant Pharmacotherapy.[56] In that article Dr. Mann proposed a three-way, randomized, double blind, placebo-controlled clinical trial to evaluate whether an antidepressant such as fluoxetine (Prozac) causes the emergence of suicidal ideation or intensifies existing suicidal ideation in certain patients.[57] He also proposed that future studies incorporate ratings for akathisia, anxiety, agitation, insomnia and other side effects to evaluate whether these side effects contributed to the emergence of suicidality in patients who received antidepressant therapy.[58] In conclusion, Dr. Mann stated:

**52.** See Transcript of Proceedings (Exhibit Z) in Def.'s Failure To Warn App., Vol. 2 (Doc. # 225) at 302.

**53.** *Id.* at 331. The minority of members who voted to change the warnings opined that the change should be for *all* antidepressant drugs; none voted that the change should be limited to SSRI drugs. See PDAC Transcript (Exhibit Z) in Pfizer's Failure To Warn Ex., Vol. 2 (Doc. # 225) at 332:4–18.

**54.** *Id.* at 129:16–19.

**55.** See June 3, 1992 Letter From C. Peck to I. Hellander And S. Wolfe On 6/3/92 (Exhibit AA) in Def.'s Failure To Warn App., Vol. 2 (Doc. # 225) at 17. The PDAC had also engaged in "a fair amount of discussion about the need for more research" on the question. Casey Deposition (Plaintiff's Ex. 17 at 15:17–16:3).

**56.** Exhibit 23 in Plaintiffs' Ex., Vol. II (Doc. # 526) at 1031.

**57.** That was the same type of test that Pfizer had conducted, analyzed and reported to the FDA more than a year earlier, and that Pfizer was continuing to conduct on an ongoing basis at the time Dr. Mann's article was published. See Summary Basis Of Approval (Exhibit 6) (data from RCT), Myers Report (Exhibit 12) (same), Ryder Report (Exhibit 37) (same), all in Pfizer's Pretrial Ex. Nos. 1–25 (Doc. # 228); and Appendix Of Exhibits (Nos. 26 To 51) To Defendant Pfizer Inc.'s Pretrial Motions ("Def.'s Pretrial Ex. Nos. 726–51").

**58.** Emergence Of Suicidal Ideation And Behavior During Antidepressant Pharmacotherapy (Exhibit 23) in Plaintiffs' Ex., Vol. II (Doc. # 526) at 1031; Mann Deposition (Exhibit 3) in Plaintiffs' Ex., Vol I (Doc. # 525) at 83–86. According to plaintiffs, Dr. Mann proposed that future studies incorporate ratings for akathisia and other side effects not to evaluate whether the side effects contributed to suicidality but because this is the widely postulated "biologically plausible mechanism" which some believe will explain the paradoxical reaction of some patients becoming suicidal on SSRI drugs.

Plaintiffs insist that Pfizer has never performed a clinical trial or other test which uses the akathisia scale which Dr. Mann cites, or any other recognized measure of akathisia-like symptomatology to measure treatment-emergent agitation, restlessness, aggravation or akathisia among patients on Zoloft. Plaintiffs cite no record evidence for this proposition, and the Court disregards it. Furthermore, Dr. Mann testified that drug manufacturers have made a significant effort to see if a relationship exists between "the use of agents like SSRIs and suicidal behavior using a variety of strategies." Mann Deposition (Exhibit 3) in Plaintiffs' Ex., Vol I (Doc. # 525) at 147–48.

**1112**

Clinicians should be aware that emergence or intensification of suicidal ideation and behavior in patients receiving antidepressant treatment has been reported.... Whether certain antidepressants precipitate or aggravate suicidal ideation in a small, vulnerable subpopulation of psychiatric patients who require antidepressants is uncertain. In practice, whatever the antidepressant medication, the clinician should always monitor the patient to assess the severity of the depression and suicidal ideation, aggressive ideation or behavior, agitation and akathisia. Paradoxical suicidal ideation or behavior may be more frequent in nonresponders, patients with unrecognized akathisia, and patients with histories of attempted suicide. Therefore, the clinician should continue informing patients with depression who are being treated with antidepressant medications that depressive symptoms and/or a worsening or emergence of suicidal ideation may occasionally occur during treatment. The patient should be instructed to immediately inform the clinician should symptoms occur. The clinician can then judge whether the cause is the illness, the environment, or the treatment.[59]

After he wrote that article, Dr. Mann obtained sertraline placebo and active-control suicidal ideation and attempt data from randomized, double blind, placebo-controlled clinical trials by Pfizer—along with similar data for other SSRI and non-

SSRI drugs. On March 2, 1992, four months after the earlier article, Dr. Mann co-authored a second article which was accepted as a consensus statement by the American College of Neuropsychopharmacology ("ACNP"). In that article, Dr. Mann reviewed in detail the Pfizer data, with the similar data for other SSRI and non-SSRI drugs. Having done so, Dr. Mann and his co-authors reached the following conclusions in the ACNP consensus statement:

In conclusion, case reports suggest that a small minority of patients may experience emergent suicidal thoughts or evince such behavior during the pharmacological treatment of depression. These reports do not distinguish between the relative potential contribution of the disease process, external stressors, or the medication. Of significance, there is evidence that such emergent suicidality is not specific to any one type of antidepressant and may therefore be largely a manifestation of the natural course of the illness.... There is no evidence that antidepressants such as the selective serotonin reuptake inhibitors, for example, fluoxetine [Prozac], trigger emergent suicidal ideation over and above rates that may be associated with depression and other antidepressants. What is clear is that most patients receive substantial benefit from treatment with this drug and related antidepressants.

---

**59.** Plaintiffs claim that in his article, Dr. Mann recommended "warnings or advice to patients and physicians concerning the potential for SSRI-induced suicide." The Court, however, does not find that plaintiffs' citations actually stand for this point. In his article, Dr. Mann concluded that "the clinician should continue informing patients with depression who are being treated with antidepressant medications that depressive symptoms and/or a worsening or emergence of suicidal ideation may occasionally occur during treatment." Emergence Of Suicidal Ideation And Behavior During Antidepressant Pharmacotherpy [sic] (Exhibit 23) in Plaintiffs' Ex., Vol. II (Doc. # 526) at 1032. Dr. Mann also stated that suicidal ideation and behavior have not been associated with any particular antidepressant and it is uncertain whether certain antidepressants precipitate or aggravate suicidal ideation. *Id.*

It is good clinical practice to monitor patients receiving treatment with antidepressants with regard to general clinical progress, and in particular, suicidal ideation and impulses. It is well known that depressed patients who are responding to treatment may occasionally have brief relapses lasting one or two days in which their symptoms may recur. Side effects such as akathisia may be associated with a worsening psychiatric state. Patients should be warned that suicidal ideation may occasionally worsen in the course of treatment, as may overall depression, and that such an event would be reason for immediately contacting their doctor. Applying this standard clinical to all patients would constitute a reasonable safeguard in the event that there are, indeed, a small minority of vulnerable patients who are at risk for emergent suicidal ideation. It should be recognized that such emergent suicidal ideation may be the consequence of the patient's illness, adverse changes in the life situation, or, perhaps, in a few cases, because of an adverse effect of the antidepressant.[60]

At his deposition, Dr. Mann confirmed his personal belief that neuroleptic-induced akathisia (the classic form of akathisia

which is associated with antipsychotic medication) is a risk factor for suicidal behavior. Questioned whether SSRI drugs cause akathisia in some patients, he responded:

> SSRI drugs in some patients cause some kind of feelings of agitation, which may include some motor manifestations. It's not clear that it's exactly the same syndrome that you see in people who take antipsychotic medications, which is where akathisia was classically described. There may be an overlap, but it doesn't appear to be exactly the same type of thing.[61]

Dr. Mann also testified that the warning regarding suicide risk, along with the other adverse reaction information provided in the Zoloft package insert, was adequate to inform physicians' clinical judgments in prescribing Zoloft and that Pfizer's warnings were entirely consistent with the recommendation in the ACNP paper.[62]

Meanwhile, in March of 1991, Eli Lilly had drafted a study protocol on this issue and submitted it to the FDA. In the proposed study, Eli Lilly rejected the classic randomized controlled trial design in favor of a challenge-rechallenge study design to test whether antidepressants trigger emergent suicidal ideation or acts.[63]

60. Suicidal Behavior And Psychotropic Medication (accepted as a Consensus Statement by the ACNP Council, March 2, 1992) (Exhibit SS) in Def.'s Failure To Warn App., Vol. 4 (Doc. # 227) at 180, 182.
Plaintiffs claim that according to Dr. Mann, the consensus of the ACNP called for testing and warnings about the possible dangers of antidepressant-induced suicide. The record evidence, however, does not support such a statement. Indeed, when asked if the consensus of the ACNP was that more testing and research needed to be done, Dr. Mann stated "that wasn't in the formal conclusion section," "I don't think one can make such a specific reading of this language," and "the spirit of the communication is that gathering information using one or more of these strategies is a good idea." Mann Deposition (Exhibit 3) in Plaintiffs' Ex., Vol. I (Doc. # 525)

at 135–38. Because plaintiffs cite no record evidence for their proposition, the Court must disregard it.

61. Mann Deposition (Exhibit 3) in Plaintiffs' Ex., Vol. I (Doc. # 525) at 85:22–86:22, 88:9–19, 166:16–167:4, 169:10–20, 170:6–171:12.

62. Mann Deposition (Exhibit 3) in Plaintiffs' Ex., Vol. I (Doc. # 525) at 174:18–175:19.

63. In general, with appropriate consent forms and safeguards, "challenge-dechallenge-rechallenge" is a scientifically accepted manner of establishing causation with regard to certain side effects of drugs. Plaintiffs cite no evidence, however, that the FDA, or any ethics committee or institutional review board, approved the Eli Lilly study protocol. It is clear that such a study design poses major

On June 3, 1992, when no PDAC member agreed that "there is evidence to indicate that a particular drug or drug class poses a greater risk for the emergence and/or intensification of suicidal thoughts and acts and/or other violent behaviors," the FDA denied the Public Citizen Petition. It accordingly concluded that a change in labeling was not warranted at that time.[64]

In 1998, the Textbook of Psychopharmacology summarized the state of the matter as follows: Several reviews have examined the data relevant to the question of whether antidepressant pharmacotherapy is associated with the emergence of suicidal ideation and behavior. These studies indicate that although suicidal ideation may emerge rarely during antidepressant treatment of depressed patients, these responses occur with essentially all types of antidepressant drugs, and a causal relationship to antidepressant drugs has not been established.[65]

In 2000, plaintiffs' expert, Dr. Morton Silverman, published a book which stated:

Shortly after the market introduction of fluoxetine, a small number of case reports (e.g., Teicher, Glod, & Cole, 1990) noted the emergence of suicidal ideation in patients taking fluoxetine. A great deal of publicity in the media surrounded such reports, which hypothesized that fluoxetine may trigger emergent suicidal

and homicidal ideation in a small proportion of patients taking this medication. Further study has clarified that there is no 'increased risk of suicidal acts or emergence of substantial suicidal thoughts' among depressed patients' associated with the treatment of fluoxetine (Beasley et al., 1991). The American College of Neuropsychopharmacology Task Force review of suicidal behavior and psychotropic medication concluded that "new generation low-toxicity antidepressants, including SSRIs", may carry a lower risk for suicide than older TCAs [tricyclic antidepressants]. There is no evidence that antidepressants such as the SSRIs, for example fluoxetine, trigger emergent suicidal ideation over and above rates that may be associated with depression and other antidepressants. What is clear is that most patients receive substantial benefit from treatment with this drug and related antidepressants. (Mann, Goodwin, O'Brien, & Robinson, 1993, p. 182) Other new agents have proven to be valuable additions to the antidepressant armamentarium. Sertraline (Zoloft), paroxetine (Paxil), bupropion (Wellbutrin), venlafaxine (Effexor), nefazadone (Serzone), citalopram (Celexa), and mirtazapine (Remeron) appear to be equally effective in the treatment of depression and usually are well tolerated with relatively few side effects.[66]

---

ethical issues, for it requires "rechallenging" patients with medication to see if they experience suicidal ideation or commit suicidal acts. See Testimony Of Dr. John Davis (Exhibit 1) in Declaration OF Katherine E. Sweeney ("Sweeney Declaration") (Doc. # 555) filed December 5, 2001 at 33:8–34:1 ("it would be hard to justify to an ethical review board putting patients on a drug with the purpose of measuring how many kill themselves"); Mann Deposition (Exhibit 3) in Plaintiffs' Ex., Vol. I (Doc. # 525) at 156:6–24 (prospective studies into causal effect of suicide would not be approved by an ethical review board).

**64.** See PDAC Transcript (Exhibit Z) in Def.'s Failure To Warn App., Vol. 2 (Doc. # 225) at 302.

**65.** A. Schatzberg & C. Nemeroff, Textbook of Psychopharmacology (2d Ed.1998) at 717.

**66.** M. Goldblatt & M. Silverman, Psychopharmacological Treatment of Suicidal Patients (Chapter 6), in Review of Suicidology (Guilford 1999) (R. Maris, S. Canetto, J. McIntosh, M. Silverman eds.) at 143–44.

In clinical testing of Zoloft, Pfizer has monitored reports of adverse events to determine whether there are epidemiological signals that Zoloft may cause suicide. Also, shortly after it launched Zoloft, Pfizer formed an internal "Issues Preparedness Committee."[67] The committee, which met approximately every two weeks in early 1992, examined allegations regarding SSRI drugs and suicide and violence in 1992, and specifically monitored adverse event reports regarding Zoloft and suicide. On a month by month basis, they tracked reports which associated suicidal ideation and attempts with Zoloft therapy, and compared the number of such reports with the rising numbers of Zoloft prescriptions and patients being treated with Zoloft, to assess whether reports of suicidality increased in proportion to the increasing use of Zoloft. As Zoloft prescriptions skyrocketed, reports of suicidal ideation and attempts remained consistently few in number; they did not rise at all, much less in proportion to increasing Zoloft usage.[68]

In May 1992, Pfizer again analyzed its clinical database, which by then included more than 3300 patients. Its analysis found a lower incidence of suicide attempts in Zoloft-treated patients (.28%) than in placebo patients (.32%). It also found consistent improvement in measures of suicidal ideation in Zoloft-treated patients.[69] In June 1992, the results of this analysis were published and presented at the Collegium Internationale Neuro Psychopharmnacologicum, an international medical conference.[70] In addition, on June 19, 1992, Pfizer assembled a group of leading outside experts to independently review the Zoloft safety databases, examine whether further analysis of existing data might be useful, and discuss options for generating new data.[71]

In early 1993 an eight-year-old boy was taking Zoloft in a clinical trial which began on January 21, 1992. Before he enrolled in the trial and began to take Zoloft, he had been clinically depressed, sad and irritable for a period of three years, beginning after his parents' divorce. He had insomnia at least three times a week and was agitated, fidgety and restless. Just before he began the study, he told his mother, "I would be better off dead." For the prior two and one-half years, he had been treated with psychotherapy without medication. His mother had a history of depression, and her 19–year–old brother had committed suicide. The child initially responded

67. Members of the committee included Dr. Gretchen Dieck, a Yale-trained epidemiologist who heads Pfizer's Worldwide Safety department, and physicians and scientists who work in her department.

68. Dr. Dieck testified that Pfizer's Worldwide Safety Department uses a "reasonable possibility" in determining whether to warn about a potential adverse outcome caused by a medication. Deposition Of Gretchen Dieck (Exhibit 13) in Plaintiffs' Ex., Vol. I (Doc. # 525) at 94:7–95:15. Any change to the label, however, must be approved by the FDA through a consensus process with the drug manufacturer. See id. at 95:23–97:8.

69. See Ryder Report (Exhibit UU) in Def.'s Failure To Warn App., Vol. 4 (Doc. # 227) at 1–2, 12.

70. To the best of Pfizer's knowledge, the data and methodology in this analysis have not been challenged in any published medical literature in the intervening eight years.

71. Members of the expert panel included Dr. Daniel Casey, who had chaired the FDA's 33rd and 34th PDAC meetings; Dr. Jan Fawcett, who had represented Eli Lilly at the PDAC meeting on September 20, 1991; Dr. Richard Shader from Tufts University; Dr. Alec Walker, an epidemiologist from Harvard University; and Dr. Myrna Weissman. Casey Deposition (Exhibit WW) in Def.'s Failure To Warn App., Vol. 4 (Doc. # 227) at 29:22–24.

well to Zoloft. In late February of 1993, however, his behavior and mood remarkably changed—his mother said that he had increased energy, was very irritable and was "looking for a fight." On February 27, his mother reported that her son had recently put a necktie very tightly around his neck, leaving marks on his neck, and cut his feet with razor blades. The boy was admitted to the hospital and a clinical investigator for Pfizer spoke to the admitting physician by telephone. The investigator made a written note that "[o]ver the phone, it seemed to me as if the patient had become manic on 200 mg of Zoloft." Pfizer reported this information to the FDA.[72]

As of May 28, 1996, Pfizer had applied to the FDA for permission to market Zoloft for treatment of pediatric obsessive compulsive disorder ("OCD"). In that regard, on that date, Pfizer submitted reports which specifically reviewed the incidence of suicide ideation, gestures and attempts among Zoloft patients in adult and pediatric OCD development programs. Pfizer reported that in the adult program, eight of 1,581 patients who were treated with sertraline (0.51%) experienced serious suicide-related events

(gestures, attempts or ideation), while three of 426 patients who received placebos (0.7 %) and three of 308 patients who received an active control drug (0.97%) experienced such events. In the pediatric program for patients with OCD but not depression, patients who were in the sertraline group experienced no serious suicide-related events; the placebo group experienced one event. In the pediatric OCD program overall (portions of which did not include placebo control, and which included pediatric patients with depression or both OCD and depression), six out of 220 sertraline patients, all of whom had multiple risk factors for suicidal behavior, reported suicide attempts or ideation. The frequency rate for this group (2.7%) was identical to the rate reported for suicide attempts requiring medical care in a nationwide sample of adolescents unselected for any psychiatric or behavioral problem.[73]

On October 10, 1997, the FDA approved Zoloft as safe and effective for treatment of pediatric OCD.[74] Pfizer reported that the rate of suicidal events on Zoloft vs. placebo for children was 2.7:1—the same as the rate of suicidal events in children who were not being treated for psychiatric or behavioral problems nationwide.[75]

---

72. Patient's Notes (Exhibit 16) in Plaintiffs' Ex., Vol. I (Doc. # 525) at 017085.

73. See Letter From Dr. Martha Brumfield, Pfizer Inc. To Paul Leber (Enclosure 1: Suicide–Related Behaviors in Adults in the Sertraline Obsessive Compulsive Disorder Clinical Development Program, Enclosure 2: Suicide Related Behavior in Children and Adolescents in the Sertraline OCD Clinical Development Program) (Exhibit XX) in Def.'s Failure To Warn App., Vol. 4 (Doc. # 227).

74. See Fax From Paul David On October 10, 1997 (Exhibit MM) in Def.'s Failure To Warn App., Vol. 4 (Doc. # 227)

75. See Suicide–Related Behaviors In Children And Adolescents In The Sertraline OCD Clinical Development Program (attached to Brum-

field Letter) (Exhibit 40) in Pfizer's Pretrial Ex. Nos. 1–50 (Doc. # 229) at 18. The Court is confused by plaintiffs' argument that Pfizer ignored the "placebo control" for its pediatric group in calculating this number. Plaintiffs assert that there was only one suicidal attempt on placebo, and that the suicide attempt rate on sertraline is actually quite higher than that of placebo. In reviewing this study, however, the Court notes that Protocol 498 (which had the placebo suicidal attempt that plaintiffs refer to, i.e. one adverse reaction out of 95 placebo treated subjects) had no adverse reactions among the 92 sertraline-treated subjects. See id. at 11. Plaintiffs apparently reach their conclusion by adding the numbers from all studies in which only sertraline and not placebo is used. Plaintiffs do not explain why this calculation is valid and it is unreasonable to add suicide attempts

In 1998, Pfizer's Dr. Roger Lane wrote and published an article entitled SSRI–Induced Extrapyramidal Reactions and Akathisia: Implications For Treatment, which was pre-reviewed and approved by Pfizer's Publications Committee.[76] The article concluded that although no definite association had been established between SSRI drugs and extrapyramidal side effects (EPS), SSRI drugs "may occasionally induce" such side effects and/or akathisia. Table 3 of the article listed 28 references to akathisia, seven of which purportedly involve a report of akathisia in a patient taking Zoloft.[77] In compiling those references, Dr. Lane employed "the loosest definition of akathisia" in order to include "all case reports .... even case reports where they didn't actually say 'akathisia,' but that may have been construed as constituting what some people define as akathisia."

In July of 1999, at the request of the Irish Medicines Board ("IMB"), Pfizer conducted an analysis of its computer database of adverse events related to "suicide events," which the analysis defined as actual suicides and suicidal ideation, gestures and attempts. On at least 54 occasions, the clinical investigator and/or internal Pfizer reviewer determined that a suicide was related to Zoloft, or that the cause of the suicide was unknown.[78] After reviewing all 54 cases, Pfizer's report for the IMB concluded that the events did not demonstrate a causal relationship between Zoloft and suicide. The IMB agreed, and found that the evidence did not warrant additional or different warnings or other regulatory action.[79]

Plaintiffs cite the most recent version of the American Psychiatric Association's Diagnostic and Statistical Manual [DSM–IV–TR], which states that

> Serotonin-specific reuptake inhibitor antidepressant medications may produce akathisia that appears to be identical in phenomenology and treatment response to Neuroleptic–Induced Acute Akathisia.... The subjective distress resulting from akathisia is significant ... [and] may be associated with dysphoria, irritability, aggression, or suicide attempts.[80]

from other sertraline studies without adding suicide attempts from other placebo studies (or extrapolating from the placebo study at hand what the number might be). Pfizer's study did admit, however, that as to one patient, sertraline probably caused the adverse event when few other risk factors were present aside from a family history of depression and suicide and early onset of depression in the patient. See Adverse Experience Report (Exhibit 40) in Def.'s Pretrial Ex. Nos. 26–51Vol. II (Doc. # 526) at 17–18.

76. Exhibit 22 in Plaintiffs' Ex., Vol. II (Doc. # 526). Although the article was published after Matthew's death, it relied on anecdotal case reports which preceded July, 1991.

77. *Id.* at 197–98.

78. See Sertraline And Suicide–Related Events (Exhibit 115) in Plaintiffs' Ex., Vol. IV (Doc. # 527) at 4. In its Response To Plaintiffs' Supplemental Memorandum Explaining Significance Of Pfizer's IMB Report (Docs. # 476 and 477) filed January 22, 2001, Pfizer explained that the study protocol required investigators to attribute an adverse reaction to the study drug if they discerned a mere possibility of a causal relationship, or when they considered the cause of the event to be unknown or certain. Pfizer incorporates that response in its opposition to plaintiffs' motion for partial summary judgment.

79. According to Pfizer's report for the IMB report, there were 252 suicidal events during the Zoloft clinical trials, and 21% of them were deemed related to Zoloft by a clinical investigator, internal Pfizer reviewer, or both. Pfizer investigated these events. As to one patient who experienced a panic reaction and tried to commit suicide by intentional overdose, the Pfizer Safety Committee concluded that it was "reasonably possible" that these events are associated with "study drugs." See Sertraline And Suicide Related Events (Exhibit 115) in Plaintiffs' Ex., Vol. IV (Doc. # 527) at 11.

80. Exhibit 4 in Plaintiff's Ex., Vol. I (Doc. # 525) at 333.99.

This language appears only in Appendix B, however, which lists the provisions that the DSM–IV task Force did *not* adopt.[81]

Plaintiffs' expert, Dr. David Healy, has attested that some researchers have written that "there are grounds to suspect that some individuals may become suicidal on antidepressants."[82] Furthermore, he has opined that SSRI-induced akathisia sometimes leads to suicide and, in Matthew's case, that it triggered his suicide.[83]

● Proceedings In This Case

■ On January 24, 2000, plaintiffs filed their amended complaint in this matter. Count I alleges that Pfizer is strictly liable for marketing defects and misrepresentations concerning Zoloft. Count II alleges that Pfizer is liable under common law negligence theories for failure to test and warn about the dangers of Zoloft-induced suicide. In Kansas, product liability claims are governed by the Kansas Products Liability Act ("KPLA"), K.S.A. § 60–3301 et seq. The purpose of the KPLA is "to consolidate all product liability actions, regardless of theory, into one theory of legal liability." *Samarah,* 70 F.Supp.2d at 1202; *Patton v. Hutchinson Wil–Rich Mfg. Co.,* 253 Kan. 741, 756, 861 P.2d 1299, 1311 (1993). Under K.S.A. § 60–3302(c),

"all legal theories of recovery, e.g., negligence, strict liability, and failure to warn, are to be merged into one legal theory called a 'product liability claim.'" *Samarah,* 70 F.Supp.2d at 1202; *Savina v. Sterling Drug, Inc.,* 247 Kan. 105, 127, 795 P.2d 915, 931 (1990) (KPLA provisions apply to actions based on strict liability as well as negligence, breach of express or implied warranty, and breach of or failure to discharge duty to warn or instruct).

In the pretrial order, plaintiffs allege that Pfizer should have warned of the risks of "akathisia," "emotional blunting or disinhibition," "mania, hypomania, psychosis" and "serotonin syndrome," and the fact that these physical reactions to Zoloft "can cause some people to react in violent or suicidal ways."[84] Dr. Donald Marks, plaintiffs' warnings expert, opines that Pfizer acted in an unreasonable manner by not providing "prominent and adequate warnings about the risks of akathisia and suicide and ... cautioning physicians that [Zoloft] had not been adequately tested or approved for use in children and adolescents."[85] According to Dr. Marks, Pfizer should have warned that "adverse events, including suicide, suicide ideation, akathisia and emotional blunting, ... have been

---

81. Appendix B contains a number of proposals for new categories and axis that were suggested for possible inclusion in DSM–IV. According to the manual, the DSM–IV Task Force and Work Group subjected each proposal to a careful empirical review and invited wide commentary from the field, but determined that there was insufficient information to warrant inclusion of the listed proposals as official categories or axis in DSM–IV.

82. Healy Declaration (Exhibit 2) in Plaintiffs' Pretrial Ex., Vol. I (Doc. # 368) at ¶ 26.

83. Plaintiffs' response to Pfizer's statement of facts in its motion for summary judgment on their failure to warn claim includes responses to facts numbered 77 to 93. When Pfizer refiled this brief, however, it apparently revised its factual assertions to end at 76. The Court

therefore disregards plaintiffs' extraneous arguments as irrelevant to Pfizer's motion.

84. Pretrial Order (Doc. # 171) filed March 6, 2000 at 3–4.

85. Expert Report Of Dr. Donald Marks, M.D., Ph.D. (Exhibit R) in Def.'s Failure To Warn App., Vol. 2 (Doc. # 225) at 1–2. Dr. Marks testified that the FDA imposes a duty to warn when there is a "reasonable probability" of a causal connection which means more likely than not caused by the drug. See *id.* at 259:20–260:3. Dr. Marks also admitted that it was his opinion that, if the FDA had concluded that there was not a reasonable probability of causal relationship between Zoloft and suicide, there was no duty to warn or to test. See *id.* at 260:20–261:14.

found to occur in [a] small number of patients," that these symptoms could be due to Zoloft rather than the underlying depression and that they should be treated as such.[86] Dr. Marks admitted, however, that Dr. Healy's report did not support a conclusion that Pfizer should have warned about or tested for emotional blunting, but he believed Pfizer should have tested for a causal relationship between Zoloft and suicide and suicidal ideation.[87]

### Analysis

**I. Defendant Pfizer Inc.'s Motion For Partial Summary Judgement On Plaintiffs' Claim Of Marketing Defect and Misrepresentations (Count I) (Doc. # 505)**

Plaintiffs assert that Pfizer "has gone to great lengths to reassure doctors that the violence and suicide problems which they have heard about, mainly with its chief SSRI competitor Prozac, would not occur with Zoloft, and to assuage patient's concerns over the initial adverse effects which are frequently the harbingers of tragedy" and that this constitutes a misrepresentation of material facts. Pretrial Order (Doc. # 171) at 4. Plaintiffs do not more specifically identify a particular theory of fraudulent misrepresentation, nor do they more specifically explain any alleged so-called "marketing defect" claim. The Court therefore construes Count I as strictly a fraud count and finds that, so construed, the allegations do not satisfy the pleading requirements of Rule 9(b), Fed.R.Civ.P. Moreover, plaintiffs have cited absolutely no evidence of "great lengths" to which Pfizer has resorted to

reassure doctors in general—or Dr. Geenens in particular—that "violence and suicide problems ... would not occur with Zoloft." Count I therefore suffers a fatal failure of proof.

██ In seeking summary judgment, Pfizer first argues that plaintiffs cannot show detrimental reliance on any misrepresentation.[88] To sustain an action for fraud or misrepresentation in Kansas, plaintiffs must establish among other things that they reasonably relied and acted on the allegedly false representations to their detriment. See PIK–Civil 3d 127.40 (reasonable reliance required for fraud), 127.43 (reliance required for negligent misrepresentation); *Canterbury Ct., Inc., v. Rosenberg*, 224 Kan. 493, 503, 582 P.2d 261, 269–70 (1978) (party to whom misrepresentation is made must rely and act upon it to his detriment); *Todd v. Wichita Fed. Savings & Loan Assoc.*, 184 Kan. 492, 494, 337 P.2d 648, 650 (1959) (to secure redress for false representations, plaintiff must show that they were relied upon to his detriment); see also *Samarah*, 70 F.Supp.2d at 1209 (1999) (no evidence that treating physician relied on representations regarding suitability of medical device for particular use, plaintiff could not establish element of reliance necessary for recovery on claim for fraud). Pfizer notes that the pretrial order contains no allegation that Dr. Geenens relied on fraudulent materials and, indeed, Dr. Geenens has submitted sworn testimony that he did not rely on any marketing materials from Pfizer.

Pfizer next claims that even if plaintiffs had evidence of reliance, the "learned in-

---

**86.** Deposition of Donald Marks (Exhibit S) in Def.'s Failure To Warn App., Vol. 2 (Doc. # 225) at 222:22–224:3.

**87.** *Id.* at 228:12–20; 224–29. Dr. Marks has not drafted specific warnings that he believes Pfizer should have used. *Id.* at 205:13–18. Nor has he expressed any opinions as to

where in the Zoloft package insert a hypothetical warning should go. *Id.* at 205:19–25.

**88.** Although Pfizer discusses the reliance prong of misrepresentation, it does not concede that it made any misrepresentations to Dr. Geenens, plaintiffs or Matthew Miller.

termediary" doctrine means that Pfizer only had a duty to provide information to Dr. Geenens, not plaintiffs. Pfizer asserts that it is entitled to summary judgment because plaintiffs have not alleged or proved that Dr. Geenens, their learned intermediary, relied on any misrepresentations by Pfizer.

Plaintiffs respond that (1) they do not need to show reliance because Kansas has adopted a strict liability approach to products liability misrepresentation actions; (2) Kansas could also adopt Section 9 of the "Restatement (Third) of Torts: Products Liability" and hold manufacturers liable for innocent misrepresentations without proof of reliance; (3) the Kansas Supreme Court is likely to find that K.S.A. § 60–3305 has overruled the learned intermediary doctrine;[89] and (4) if plaintiffs are required to prove reliance, they can do so.

In support of their claim that they do not need to prove reliance because Kansas has adopted a strict liability approach to products liability misrepresentation actions, plaintiffs cite *Hurlbut v. Conoco,* 253 Kan. 515, 521, 856 P.2d 1313, 1320 (1993). Specifically, plaintiffs argue that in 1993, the Kansas Supreme Court mentioned strict products liability, particularly with regard to a misrepresentation claim, as a viable form of recovery. In Hurlbut, the

Kansas Supreme Court noted that because plaintiff had alleged strict liability, he claimed that he did not need to determine which of two possible causes (only one of which involved defendant's product) had produced the explosion that precipitated his lawsuit. See *id.* The trial court overruled defendant's motion for summary judgment even though plaintiff had not set forth facts or calculations on which his experts relied to prove liability. See *id.* The case proceeded to trial and after a plaintiff's verdict, defendant appealed the denial of its summary judgment motion. See *id.* at 518–19, 856 P.2d at 1320. On appeal, however, causation rather than reliance was at issue.[90] Therefore Hurlbut does not stand for the proposition that plaintiffs do not need to show reliance in product liability misrepresentation actions.

In arguing that proof of reliance is not necessary, plaintiffs also rely on Section 9 of the "Restatement (Third) of Torts: Products Liability," which states that manufacturers could be liable for even innocent misrepresentations of material fact. Pfizer points out that Kansas has not adopted the Third Restatement (or otherwise imposed strict liability for innocent misrepresentations) and that even if it had done so, the Third Restatement requires proof that plaintiffs' injury was "caused by the misrepresentation."[91] Citing *Dela-*

---

**89.** Plaintiffs' Misrepresentation Response (Doc. # 516) at 8 n. 1.

**90.** Hurlbut is somewhat confusing because it appears that the Kansas Supreme Court relied on expert testimony at trial in determining that defendant's pretrial summary judgment motion was properly denied. In that regard, the Kansas Supreme Court treated defendant's summary judgment motion more like a motion for judgment as a matter of law. It dealt separately, however, with defendant's motion for judgment as a matter of law. The issue is particularly confusing in light of the fact that a denial of summary judgment is typically not subject to appellate review. See

*Matter of Ziebell's Estate,* 2 Kan.App.2d 99, 101, 575 P.2d 574, 576 (1978).

**91.** Memorandum In Support Of Motion For Partial Summary Judgment On Plaintiff's Claim Of Marketing Defect And Misrepresentation ("Pfizer's Misrepresentation Memorandum") (Doc. # 506) filed September 12, 2001 at 9 (citing Restatement Of Torts 3d § 9, Comment C).

Pfizer also asserts that the Kansas Supreme Court has explicitly rejected the Third Restatement, see *Delaney v. Deere & Co.,* 268 Kan. at 793, 999 P.2d at 946, and that for this Court to apply it would violate the fundamental principles of *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

*ney,* 268 Kan. at 793, 999 P.2d at 946, plaintiffs argue that if Kansas has not imposed strict liability for innocent misrepresentations, it is only because Kansas favors an even more pro-consumer strict liability stance. In *Delaney v. Deere,* the Kansas Supreme Court declined to adopt Comment 1 of Section 9 of the Third Restatement because Section 9 would have required Kansas to adopt the reasonable alternative design standard—and an exclusive risk/utility analysis of that reasonable alternative design—to determine whether a subject product is defective. See *id.* The Kansas Supreme Court decided that in Kansas, "[t]he ultimate determination remains whether the product is defective and dangerous beyond a reasonable consumer's expectations." *Id.*

In this case, however, plaintiffs' argument is unavailing because the Third Restatement requires proof that plaintiffs' injury was "caused by the misrepresentation," and the Kansas Supreme Court has noted that "[t]he reliance element of misrepresentation serves the function of causation in fact: that the misrepresentation causes someone to act or refrain from acting." *Tetuan v. A.H. Robins Co.,* 241 Kan. 441, 468, 738 P.2d 1210, 1230 (1987) (quoting Restatement (Second) of Torts § 546, Comment B). For plaintiffs to recover for misrepresentation under Kansas law, they must show reliance.

 Regarding Pfizer's learned intermediary argument, that doctrine has been summarized as follows:

> Under the learned intermediary doctrine, a prescription drug manufacturer's duty to warn "is satisfied when the prescribing doctor is informed of a drug's inherent risks." *Nichols v. Central Merch., Inc.,* 16 Kan.App.2d 65, 67,

817 P.2d 1131, 1133 (1991). According to the Kansas Supreme Court, the "rule is based upon the theory that the physician acts as a learned intermediary between the drug manufacturer and the patient." *Humes v. Clinton,* 246 Kan. 590, 600, 792 P.2d 1032, 1039 (1990). Because "prescription drugs are available only to a physician, it is the physician's duty to inform himself or herself of the characteristics of the drugs prescribed and to exercise his or her judgment of which drug to administer in light of the drug's propensities and the patient's susceptibilities." *Id.* The learned intermediary doctrine allows the manufacturer to "assume a patient places reliance on the physician's judgment and relieves the manufacturer of a duty to assist the physician in communicating with patients." *Id.* at 601, 792 P.2d at 1039. In analyzing whether a warning is sufficiently adequate to inform the treating physician, a court must determine "whether the warning is 'reasonable under the circumstances.'" *Id.* at 606, 792 P.2d at 1043.

*Samarah,* 70 F.Supp.2d at 1204.

In support of their claim that the Kansas Supreme Court is likely to find that K.S.A. § 60–3305 has overruled the learned intermediary doctrine, plaintiffs again cite *Delaney,* 268 Kan. at 779, 999 P.2d at 938–39. In that case the Kansas Supreme Court declined to apply K.S.A. § 60–3305 to manufacturing and design defect claims because to do so would restrict plaintiffs' abilities to recover for dangers which are open and obvious. Plaintiffs also cite *Green v. Smith & Nephew AHP, Inc.,* 245 Wis.2d 772, 629 N.W.2d 727, 743 (2001), as evidence of a national

---

Pfizer also contends that the trend in Kansas law, as evidenced by the Kansas Product Liability Act, is to limit the rights of recovery in products liability suits. See Pfizer's Misrep-

resentation Reply (Doc. # 519) at 10 n. 8 (citing *Patton v. Hutchinson Wil–Rich Mfg. Co.,* 253 Kan. 741, 861 P.2d 1299, 1309 (1993)).

trend to re-emphasize consumer expectations in strict liability cases.

■ Plaintiffs' argument that Kansas has jettisoned the learned intermediary doctrine, or is about to do so, is without merit. Since 1981—when Section 60–3305 was enacted—Kansas courts have repeatedly applied the learned intermediary rule. See *Humes v. Clinton,* 246 Kan. 590, 602, 792 P.2d 1032, 1040 (1990); see also *Savina,* 247 Kan. at 122, 795 P.2d at 928; *Johnson v. American Cyanamid Co.,* 239 Kan. 279, 286, 718 P.2d 1318, 1324 (1986). Federal courts applying Kansas law have done likewise. See, e.g., *Ralston v. Smith & Nephew Richards, Inc.,* 275 F.3d 965, 974 (10th Cir.2001); *Wright ex rel. Trust Co. Of Kansas v. Abbott Lab., Inc.,* 259 F.3d 1226, 1233–34 (10th Cir.2001).

Plaintiffs' final argument is that "[d]espite his contrary protestations and affidavit, ... testimony indicates that Dr. Geenens, in all likelihood, bought in—hook, line and sinker—to the subliminal Pfizer marketing message."[92] Plaintiffs' Misrepresentation Response (Doc. # 516) at 10. In particular, plaintiffs assert that "Pfizer knew that it could influence prescribing physicians specifically about the suicide-causing potential of Zoloft and other SSRI drugs in subtle ways, and that it formulated its marketing plan in a manner which would capitalize on that knowledge."[93] *Id.* Plaintiffs have cited no evidence, however, which raises a genuine issue of material fact whether Dr. Geenens relied on subtle and subliminal marketing influences, unknown to even himself, which were fraudulent. Plaintiffs do not cite a single statement or representation which Pfizer arguably knew was false when it was made. Also, Dr. Geenens has unequivocally testified that he did not review any documentation which Pfizer representatives gave him[94] and said that if Pfizer gave him an article, "I will pick it apart ... I'm not interested."[95] Dr. Geenens evidently knew that Pfizer was trying to influence him and took measures to guard against such influence. Plaintiffs cite no evidence that Dr. Geenens' testimony in this respect is untruthful; in fact, they admit that he does not read pharmaceutical marketing, advertising or promotional materials provided by any manufacturer

**92.** Pfizer contends that plaintiffs are barred from making this argument since they did not do so in the Pretrial Order (Doc. # 171). It is well established that "[t]he pretrial order supercedes all pleadings and controls the subsequent course of the case." *Metzger v. City of Leawood,* 144 F.Supp.2d 1225, 1258 (D.Kan. 2001) (citing *Steil v. Humana Kansas City, Inc.,* 124 F.Supp.2d 660, 665 (D.Kan.2000); Fed.R.Civ.P. 16(e); and D. Kan. Rule 16.2(c)). The Court agrees that the pretrial order does not sufficiently articulate a viable claim for fraud. It also finds that plaintiffs' claim is not well taken on the merits.

Pfizer also contends that when the Court ruled on Defendant Pzifer Inc.'s Motion *In Limine* No. 13 To Exclude All Zoloft Promotional, Marketing, Advertising And Sales Training Materials (Doc. # 272) filed April 28, 2000, it rejected plaintiffs' theory of "subliminal reliance." In its ruling, the Court held that because they were irrelevant and unfairly prejudicial, marketing materials that Dr. Geenens had not seen would not be admitted at trial. See Minute Sheet (Doc. # 500) filed September 5, 2001. This ruling does not necessarily bar plaintiffs from making a "subtle influence" argument, however, based on documents which Dr. Geenens did receive from Pfizer.

**93.** Of course, to prove fraud, plaintiffs must also prove that the representations by Pfizer were known to be false at the time they were made. See *Smith v. Stephens,* 23 Kan.App.2d 1013, 1015, 940 P.2d 68, 69 (1997).

**94.** See Geenens Deposition (Exhibit G) in Pfizer's Marketing Defect Appendix (Doc. # 212) at 79 (throws pamphlets in "file 13" after representatives leave), 178:1–8 (does not review Pfizer pamphlets), 178–79 (does not read Pfizer promotions or advertisements).

**95.** *Id.* at 131:22–25.

or contained in any scientific and medical articles and journals.[96] In the final analysis, because plaintiffs' position is unsupported by record evidence, it rests on nothing but the hope that a jury may refuse to believe Dr. Geenens. Plaintiffs' hope that something may turn up at trial, or that the jury will disbelieve Dr. Geenens, is insufficient to survive summary judgment. See *Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir.2001) (plaintiffs may not stave off summary judgment armed with only hope that jury might disbelieve witnesses' testimony); see also *Corrugated Paper Products, Inc. v. Longview Fibre Co.*, 868 F.2d 908, 914 n. 7 (7th Cir.1989) (mere anemic hope that information contradicting deposition testimony would be elicited under cross-examination at trial insufficient to withstand motion for summary judgment); *Natrona Serv., Inc. v. Continental Oil Co.*, 435 F.Supp. 99, 106 (D.Wyo.1977) (where plaintiffs have failed to turn up substantial evidence in support of their theory, and defendants have introduced evidence negating theory, unreasonable to assume trial would provide plaintiffs with any greater opportunity to prove their theory, especially when the most that can be hoped for is to discredit the defendants' witnesses at trial). In *Samarah*, the district court stated:

> ... Dr. Poole's deposition testimony indicates that, in each case, his decision to use pedicle screws was made after considering the information contained in the relevant medical literature, the factual circumstances underlying each particular patient's medical condition, and his own medical judgment. There is simply no evidence in the record to support the allegation that Dr. Poole relied on any representations, fraudulent or otherwise,

regarding the TSRH device's suitability for use in spinal fusion surgery. Absent any such proof, plaintiff cannot establish the element of reliance necessary for recovery on his claim for fraud, and summary judgment in favor of defendants with respect to plaintiff's fraud-based claims is therefore appropriate.

70 F.Supp.2d at 1209.; see also *In re Orthopedic Bone Screw Litigation*, Nos. 3–96–1095, 4–96–1160, 3–96–1094, 3–96–1090, 4–96–1157, 97–1137, 3–96–1098, 1999 WL 628688, at *14–15 (D.Minn. Mar.8, 1999) (summary judgment appropriate when plaintiffs presented no evidence that treating physicians were misled by seminars or promotions or that they relied on defendants' representations to plaintiffs' detriment); *Greiner v. Sofamor*, No. 4–95–645, 1999 WL 716891, at *4–5 (D.Minn. Mar.8, 1999). Pfizer is therefore entitled to summary judgment on plaintiffs' marketing defect and misrepresentation claim.

## II. Defendant Pfizer Inc's Motion For Partial Summary Judgment On Plaintiffs' Failure To Warn Claim (Count II) (Doc. # 504)

Plaintiffs claim that Pfizer's package insert and marketing materials

> ... do not warn about the risk of "SSRI-induced" akathisia, do not warn about emotional blunting or disinhibition, do not warn about the risk of mania, hypomania and psychosis, do not warn about the "serotonin syndrome," and do not warn that these physical reactions to the drug can cause some people to act in violent or suicidal ways, or, indeed, that there is an increased risk of suicide caused by this drug at all. Nor are there any special and appropriate words of caution or warning about

---

**96.** Plaintiffs' Misrepresentation Response (Doc. # 516) at 5 (admitting Pfizer's uncontroverted facts that "When Dr. Geenens receives marketing, advertising or promotional materials for drugs, he immediately throws them into the trash can and does not read them" and that "[s]imilarly, Dr. Geenens does not read marketing, advertising or promotional materials concerning drugs contained in the scientific and medical journals he reads").

the administration of Zoloft to children and adolescents.

Pretrial Order (Doc. # 171) at 3–4. Pfizer seeks summary judgment on plaintiffs' failure to warn claim, alleging that as a matter of law (1) plaintiffs cannot establish that Zoloft caused Matthew's death (general causation); (2) the record contains no evidence that a different or alternate warning would have changed Dr. Geenens' decision to prescribe Zoloft to Matthew (proximate causation); (3) the package inserts which Pfizer provided to Dr. Geenens in July 1997 were adequate and contained the very information which plaintiffs complain had been omitted; and (4) plaintiffs do not have expert testimony to support their warning claim.[97] The Court will first address Pfizer's arguments as to general and proximate causation.

Preliminarily, the Court notes that plaintiffs' failure to warn claim involves three issues as to causation: (1) general causation, i.e. does Zoloft cause depressed patients to commit suicide; (2) specific causation, i.e. did Matthew Miller commit suicide because of Zoloft or for some other reason; and (3) proximate causation; i.e. whether Dr. Geenens would have prescribed Zoloft for Matthew if he had received adequate warning of the danger of Zoloft-induced suicide. Plaintiffs' arguments on causation are sometimes confusing because while they purport to address the question of specific causation—and in fact they seek summary judgment on that issue—they are actually addressing the question of proximate causation (and claiming that Pfizer bears the burden of proof on that issue). Plaintiffs admit that if the jury finds that Zoloft was not the cause of Matthew's suicide—an issue which incorporates both general and specific causation—"the question of whether Pfizer had a duty to warn about Zoloft—induced suicide will be irrelevant."[98] The Court therefore understands plaintiffs' arguments on causation to relate only to proximate causation and addresses them only in that context.

### A. General Causation

▮ Pfizer's first argument is that plaintiffs' claim must fail because they

**97.** Plaintiffs' Count II is actually for both failure to warn and failure to test. See Amended Complaint (Doc. # 108) and Pretrial Order (Doc. # 171). In their response to Pfizer's motion, however, plaintiffs concede that "[t]he duty to warn and the duty to test are, for all practical purposes, coextensive." Plaintiffs' Brief In Support Of Responses To Pfizer's Motions For Summary Judgment On Failure To Warn And Failure To Test Theories ("Plaintiffs' Failure To Warn Response") (Doc. # 515) filed October 3, 2001 at 11–12 (citing *Richter v. Limax Int'l, Inc.*, 45 F.3d 1464, 1471 (10th Cir.1995) ("Manufacturers do not have a duty to test for inconceivable dangers, nor do they have a duty to test for every conceivable danger. They do have a duty to warn of dangers of harmful effects arising from the foreseeable use and misuse of a product that are known or are readily foreseeable in the state of art."); *Lindquist v. Ayerst Labs. Inc.*, 227 Kan. 308, 320, 607 P.2d 1339, 1350 (1980) (any obligation to test is part of the duty to act in manner "reasonably necessary to secure the production of a safe product." (internal quotations omitted)); PIK–Civil 3rd § 128.04 commentary and cited cases). Previously, Pfizer had sought summary judgment on plaintiffs' failure to test claim; it withdrew that motion during a telephone hearing with the Court on September 5, 2001. See Motion For Summary Judgment On Plaintiffs' Failure To Test Claim (Doc. # 215) filed April 18, 2000; Minute Sheet (Doc. # 500). Based on plaintiffs' response to its failure to warn motion, Pfizer asserts that plaintiffs have conceded that there is no separate and independent duty to test under Kansas law and therefore plaintiffs have effectively abandoned that claim. Because the parties appear to agree on this point, the Court will only analyze plaintiffs' claim as one for failure to warn.

**98.** Plaintiffs' Brief In Support Of Refiled Motion For Partial Summary Judgment (Doc. # 524) filed October 23, 2001.

have no proof of general causation.[99] Under Kansas law, regardless of the theory upon which recovery is sought for injury in a products liability case, proof that a product defect caused the injury is a prerequisite to recovery. See *Wilcheck v. Doonan Truck & Equip., Inc.*, 220 Kan. 230, 235, 552 P.2d 938, 942 (1976); *Samarah*, 70 F.Supp.2d at 1202. In the case of failure to warn, plaintiffs must produce evidence that Zoloft causes the behavior of which they complain, at least in some people. See *Smith v. Pfizer*, No. 98–4156, 2001 WL 968369, at *7 (D.Kan. Aug.14, 2001) (plaintiff must show that Zoloft can cause adverse reaction in order to prevail on failure to warn claim). Unfortunately, suicidality (including ideation, attempts and completed suicides) is a leading public health problem. See *Washington v. Glucksberg*, 521 U.S. 702, 730, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). It occurs in many people who are not exposed to Zoloft (or any other medicine). On the other hand, many people who are exposed to Zoloft do not become suicidal. Plaintiffs therefore cannot meet their burden of proving medical causation without expert testimony that Zoloft more likely than not caused Matthew's suicide. See *In re Breast Implant Litig.*, 11 F.Supp.2d 1217, 1225–26 (D.Colo.1998) (because plaintiffs' injuries occur commonly in women without breast implants, plaintiffs must present expert testimony that exposure to breast implants more than doubled risk of alleged injuries); *Bacon v. Mercy Hosp.*, 243 Kan. 303, 307, 756 P.2d 416, 420 (1988) (unless lack of reasonable care or existence of proximate cause is apparent to average layman from common knowledge

or experience, expert testimony required to establish causation); see also *Dodge v. Cotter Corp.*, 203 F.3d 1190, 1200 n. 12 (10th Cir.2000) (given novelty of medical causation theory linking exposure to molybdenum with osteoarthritis and bony extoses, essential that expert testimony is relevant and reliable and particular opinion based on valid reasoning and methodology); *Renaud v. Martin Marietta Corp.*, 972 F.2d 304, 307 (10th Cir.1992) (summary judgment proper where plaintiff failed to present sufficiently reliable epidemiological evidence that effluents in defendants' water system caused cancer and seizures); *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1320 (11th Cir.1999) (medical expert testimony essential to prove causation; summary judgment properly granted where plaintiffs' medical expert testimony inadmissible); *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 319 (7th Cir.1996) (summary judgment properly granted where plaintiff failed to present admissible expert testimony that nicotine patch caused heart attack; courtroom is not place for scientific guesswork, even of the inspired sort); *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311 (9th Cir.1995) (summary judgment affirmed where plaintiffs failed to present admissible evidence that use of bendectin caused birth defects).

To support their claim of general causation, plaintiffs have relied exclusively on the testimony of Dr. Healy—their liability expert on that issue. The Court, however, has excluded Dr. Healy's testimony on that subject. See Memorandum And Order (Doc. # 559) filed February 8, 2001. Because plaintiffs have no scientific evidence of general causation, their claim of failure to warn must fail as a matter of law.[100]

**99.** See Memorandum In Support Of Motion For Summary Judgment On Plaintiffs' Failure To Warn Claim ("Pfizer's Failure To Warn Memorandum") (Doc. # 504) filed September 12, 2001 at 29.

**100.** To the extent plaintiffs may argue that Pfizer bears the burden of showing lack of

general causation, they are clearly incorrect. In the cases which plaintiffs cite, plaintiff either retained the burden of proving general causation, see *Mason v. Texaco, Inc.*, 741 F.Supp. 1472, 1478–79 (D.Kan.1990), *Arnold v. Riddell, Inc.*, 882 F.Supp. 979, 989 (D.Kan. 1995), and *Wooderson v. Ortho Pharm. Corp.*,

### B. Proximate Causation

Pfizer also argues that it is entitled to summary judgment because plaintiffs cannot show that an failure to warn proximately caused Matthew's death. Plaintiffs' initial response is that they do not bear the burden of proof on this issue-Pfizer does. Plaintiffs' argument is that "[i]f the Court holds or the jury finds that Pfizer violated federal warnings, regulations or its common law duty to warn/test, then the presumption of causation switches the burden of proof to Pfizer." [101] Pfizer argues that Kansas law does not permit, much less require, such burden-shifting.

 In order to survive summary judgment, plaintiffs must provide evidence that a failure to warn proximately caused Matthew's death. See *Wooderson*, 235 Kan. at 409, 681 P.2d at 1057; see also *Eck*

*v. Parke, Davis & Co.*, 256 F.3d 1013, 1018 (10th Cir.2001) (citing *Mazur v. Merck & Co.*, 742 F.Supp. 239, 262 (E.D.Pa.1990)). Plaintiffs are correct that Kansas law allows a rebuttable presumption of causation once plaintiffs have established that a warning is inadequate. If plaintiffs prove that Pfizer failed to provide a proper warning, Kansas law presumes that a doctor would have heeded a proper warning. See *Wooderson*, 235 Kan. at 407, 681 P.2d at 1057. Essentially, the law presumes that but for the inadequate warning, the patient would not have been harmed, since the doctor would have given the patient an adequate warning if she or he had ever received it, and the inadequate warning is therefore the cause of the patient's injury. See *Wooderson*, 235 Kan. at 409, 681 P.2d at 1057; *Arnold*, 882 F.Supp. at 996; *Meyerhoff*, 852 F.Supp. at 946–47; [102] *Mason*,

235 Kan. 387, 393–99, 681 P.2d 1038, 1045–48 (1984), or general causation was not at issue, see *Meyerhoff v. Michelin Tire Corp.*, 852 F.Supp. 933, 936 (D.Kan.1994). In short, plaintiffs have no legal support for the proposition that Pfizer bears the burden of proof that Zoloft does not cause suicide through the mechanism of akathisia. Plaintiffs' logic in this regard is so circular as to be self-evidently flawed. Plaintiffs admit that before the burden would shift to Pfizer, they would be required to prove that the warnings which Pfizer gave were illegal or inadequate to advise them of the risk that Zoloft causes suicide through akathisia in some depressed patients. Even under their theory, in order to satisfy their burden of proof, plaintiffs would necessarily have to prove some degree of general causation-either that there was "reasonable evidence of a serious hazard" with Zoloft, under 21 C.F.R. § 201.57(e), or that the drug had "dangerous propensities." *Wooderson*, 235 Kan. at 401, 681 P.2d at 1050.

**101.** Plaintiffs' Failure To Warn Response (Doc. # 515) at 11–12

**102.** Plaintiffs cite Meyerhoff for the proposition that the presumption of causation is essentially irrebuttable until trial. In *Meyerhoff*, however, the district court did not hold that the presumption was irrebuttable; rather, it found that defendant had failed to put forth

sufficient evidence to rebut it. Ultimately, defendant's motion for a judgment as a matter of law was granted when plaintiff produced insufficient evidence at trial that defendant could have designed a better warning. See *id.* at 947–48.

Plaintiffs also rely on *Dole Food Co. v. North Carolina Foam Indus.*, 188 Ariz. 298, 935 P.2d 876, 883–84 (1996), which held that a presumption of causation survived defendant's contrary evidence. In that case, however, the court found that "a reasonable jury could still infer that [plaintiff] would have heeded adequate warnings because [defendant's] evidence did not show that [plaintiff] received clear and adequate warnings." *Id.* The Court did not hold that the presumption never dissipates, merely that defendant had failed to rebut the presumption in that case. See *id.*

Plaintiff also cites K.S.A. § 60–414 for the proposition that the presumption permanently shifts the burden of proof of proximate causation to defendant. Section 60–414 does establish two kinds of presumptions, those that permanently shift the burden of proof when plaintiff has put forth facts that have any probative value as evidence of the existence of the presumed fact, and those that disappear if the facts from which the presumption arises have no probative value as evidence of the presumed fact. In this case, plaintiffs' evi-

741 F.Supp. at 1490. Defendant may rebut this presumption by establishing that although the prescribing physician would have read and heeded the warning or additional information, this would not have changed his or her course of treatment. See *Eck*, 256 F.3d at 1019. If Pfizer provides credible evidence to rebut the presumption, the presumption disappears and the burden shifts back to plaintiffs to affirmatively prove causation. *See id.; Woulfe v. Eli Lilly & Co.*, 965 F.Supp. 1478, 1483 (E.D.Okla.1997).

> To submit the case to a jury, [plaintiff] must either discredit the physicians' testimony or call into question the substance of the testimony, or otherwise demonstrate that the alleged failure to warn was the proximate cause of their injuries. Such a showing requires that the plaintiff "demonstrate that the additional non-disclosed risk was sufficiently high that it would have changed the treating physician's decision to prescribe the product for the plaintiff."

*Eck*, 256 F.3d at 1019.[103] Thus, once the presumption is rebutted, plaintiffs must further establish proximate causation by showing that had Pfizer issued a proper warning to the learned intermediary, he would have altered his behavior and the injury would have been avoided. *Id.* at 1018. To submit the case to a jury, plaintiffs must either discredit Dr. Geenens' testimony or call into question the substance of the testimony, or otherwise demonstrate that the alleged failure to warn was the proximate cause of their injuries. See *id.* Such a showing requires that plaintiff "demonstrate that the additional non-disclosed risk was sufficiently high that it would have changed the treating physician's decision to prescribe the product for the plaintiff." *Id.* As discussed below, plaintiffs have not met that burden.

The Court assumes without deciding that plaintiffs are entitled to the benefit of a presumption of causation. It also holds that Pfizer has successfully rebutted that presumption through Dr. Geenens' testimony that a different warning would not have mattered.[104] As noted above, Dr.

dence regarding the alleged inadequacy of Pfizer's warning does not have any probative value as to whether Dr. Geenens knew about the risk of Zoloft-induced suicide. The presumption is therefore in the first category and disappears when Pfizer puts forth contrary evidence.

103. Eck is an Oklahoma case. As Pfizer points out, however, Oklahoma applies the same rebuttable presumption concerning warnings that Kansas utilizes.

104. See Pfizer's Failure To Warn Memorandum (Doc. # ) at 44 (citing *Eck*, 256 F.3d at 1024). Pfizer also cites a litany of cases from other circuits in support of this argument: *Odom v. G.D. Searle & Co.*, 979 F.2d 1001, 1003–04 (4th Cir.1992) (summary judgment appropriate where physician testified that different warning would not have changed his decision to prescribe device); *Willett v. Baxter Intern., Inc.*, 929 F.2d 1094, 1098–99 (5th Cir.1991) (failure to warn was not proximate cause of plaintiff's injury where only reasonable conclusion was that adequate warning would not have affected physician's decision

to proceed with surgery); *Dyer v. Danek Med., Inc.*, 115 F.Supp.2d 732, 742 (N.D.Tex.2000) (granting summary judgment where trier of fact would reasonably infer that physician's decision would have been unchanged even if warned); *Dyson v. Winfield*, 113 F.Supp.2d 35, 41 (D.D.C.2000) (granting defendant's motion for summary judgment); *Lawson v. Smith & Nephew Richards, Inc.*, 1999 WL 1129677, at *6 (N.D.Ga.1999) (where learned intermediary has actual knowledge of substance of alleged warning and would have taken same course of action even with information plaintiff contends should have been provided, courts typically conclude that learned intermediary doctrine applies or that causal link is broken and plaintiff cannot recover); *Talley v. Danek Med., Inc.*, 7 F.Supp.2d 725, 730 (E.D.Va.1998) (plaintiff must not only show that manufacturer's warning was inadequate but that such inadequacy affected physician's use of product and thereby injured plaintiff), aff'd, 179 F.3d 154 (4th Cir.1999); *In re Norplant Contraceptive Prods. Liab. Litig.*, 955 F.Supp. 700, 710–11 (E.D.Tex.1997) (granting summary judgment

Geenens stated under oath that even if he had been provided the information and opinions expressed by Dr. Healy, and received plaintiffs' additional warnings, he would have prescribed Zoloft for Matthew without further warning or instructions. This testimony is uncontroverted, and it rebuts the presumption that Dr. Geenens would have altered his treatment decision if he had received additional warnings. See *Eck*, 256 F.3d at 1020–21 (physician's testimony that she would not have changed her course of treatment even if she had known information plaintiff claimed she did not have was sufficient to rebut presumption).

*Woulfe*, 965 F.Supp. at 1478, is instructive on this point.[105] There, plaintiff claimed that Eli Lilly's failure to warn about the risk of Prozac-induced suicide had caused or contributed to his father's death. *Id.* at 1479. The district court found that even if Eli Lilly's warning was inadequate, even though Oklahoma "embraces a rebuttable presumption that an adequate warning would have been read and heeded," Eli Lilly had successfully rebutted the presumption by offering the undisputed testimony from the prescribing physician that he would have prescribed Prozac even if the labeling had contained plaintiff's suggested warning. *Id.* at 1482, 1486 (citing *Daniel v. Ben E. Keith, Co.*, 97 F.3d 1329 (10th Cir.1996)). In an affidavit, the treating physician testified that he was aware of the information which Eli Lilly provided in the PDR and that even if the package insert had contained plaintiff's proposed warning, he would have prescribed Prozac. See *id.* at 1481.

Similarly in this case, Dr. Geenens' testimony rebuts the presumption that a different warning would have altered his treatment decision. The Court's inquiry then looks to whether plaintiffs have come forward with evidence sufficient to submit the case to a jury to determine whether inadequate warnings were a proximate cause of Matthew's injuries. See *id.* at 1019 (citing *Woulfe*, 965 F.Supp. at 1483; *Garside v. Osco Drug, Inc.*, 976 F.2d 77, 81 (1st Cir. 1992)[106]). As noted, Dr. Geenens' testimo-

---

where physicians testified unequivocally that no information plaintiffs alleged should have been provided would have changed their minds about whether to prescribe drug at issue), *aff'd*, 165 F.3d 374 (5th Cir.1999); *Chambers v. G.D. Searle & Co.*, 441 F.Supp. 377, 384 (D.Md.1975) (granting motion for directed verdict where as result of what physician knew and conclusions he drew from what he knew, it would have made no difference if warnings were in form which plaintiff contends would be adequate), *aff'd*, 567 F.2d 269 (4th Cir.1977).

**105.** Plaintiffs point out that Woulfe settled on appeal and imply that the Tenth Circuit would have reversed the district court's holding, but this argument is pure speculation.

**106.** Plaintiffs rely heavily on *Garside*, 976 F.2d at 77, in which the First Circuit held that "a physician's statement about what s/he would have done in the face of an adequate warning raises a credibility issue which must be decided by a jury." See *id.* at 83 n. 9. In that case, the affidavit of the treating physi-

cian showed that he knew of a connection between the drug and the adverse reaction at the time of his affidavit in (1989), but not at the time of the injury (in 1982). 976 F.2d at 82. Based on the non-conclusive nature of this testimony, the First Circuit reversed the entry of summary judgment in favor of the drug manufacturer. See *id.* at 82 (citing *Stanback v. Parke, Davis & Co.*, 657 F.2d 642, 645 (4th Cir.1981) (holding that warning about risk of acquiring neurological disorder from ingesting drug would not have altered physician's behavior where his decisions and actions were made in full knowledge of that information)). Here, however, Dr. Geenens has unequivocally sworn that "[a]t the time I prescribed Zoloft for Matthew Miller, I knew published case reports and adverse-event reports to the FDA had described instances of patients reporting suicidal ideation and attempting or committing suicide while undergoing psychotherapy treatment, which included the use of selective serotonin reuptake inhibitors." Geenens Affidavit (Exhibit A) in Reply In Support Of Pfizer's Motion For Partial Summary Judgment On Plaintiffs' Failure

ny is unrefuted, and in this case plaintiffs have not raised a genuine issue of material fact that would cause a reasonable jury to discredit it. This is particularly true because (1) plaintiffs have not proposed a specific warning which might have more clearly communicated to Dr. Geenens the risks of which they complain; (2) plaintiffs have not shown that the warning improvements which they generally sponsor would have been material to the treatment decisions of reasonable physicians or to Dr. Geenens in particular; and (3) Dr. Geenens was already well aware of the information which plaintiffs claim Pfizer should have supplied.[107] No reasonable jury comparing the Zoloft package insert against plaintiffs' allegations that Pfizer did not warn about the risk of SSRI-induced akathisia, emotional blunting, disinhibition, mania, hypomania, psychosis, serotonin syndrome and violent or suicidal behavior, would find that Dr. Geenens is lying when

he says that additional warnings were not necessary and would not have changed his decision to prescribe Zoloft to Matthew.[108]

Plaintiffs take specific issue with this view of the record, citing the following deposition testimony by Dr. Geenens:[109]

Q. You would heed any warning that the drug manufacturer gave you about risks of their drug, wouldn't you?

A. I would consider that in my clinical decision-making.

Q. Well, can you give me any circumstance in which you in your clinical decision-making would ignore a bold-faced warning in the package insert for a psychoactive drug?

A. Bold print black box is information that I would incorporate into my clinical decision-making.

Q. Dr. Geenens, I won't quibble with you. I just want to know if there is any circumstance you can evision where you

To Warn Claim ("Pfizer's Failure To Warn Reply") (Doc. # 518) filed October 15, 2001 at ¶ 9.

**107.** Dr. Geenens reviewed selected pages of Dr. Healy's deposition testimony, Dr. Healy's expert reports of August 13 and December 10, 1999 and March 6, 2000 (including Dr. Healy's article on Zoloft And Suicide: Causal Mechanisms), the Hindmarch Study, and Dr. Healy's article titled Emergence Of Antidepressant Induced Suicidality. Dr. Geenens swore that none of these documents caused him to believe that he was uninformed or misinformed of any clinically significant risk that would have affected his treatment of Matthew in June and July 1997. Furthermore, Dr. Geenens swore that even if he had seen those specific materials before July 21, 1997, he would have prescribed Zoloft 50 mg. for Matthew because it was his medical judgment that it was in Matthew's best interest. See Geenens Affidavit (Exhibit A) in Pfizer's Failure To Warn Reply (Doc. # 518) at ¶¶ 8, 15.

**108.** In so holding, the Court does not disregard the possible bias in Dr. Geenens' testimony arising from his business relationship with Pfizer, i.e. the fact that at or near the

time he prescribed Zoloft for Matthew, Dr. Geenens was a paid consultant for Pfizer. Rather, the Court holds that no reasonable jury would discredit his testimony—which is not refuted by any direct of circumstantial evidence—on that ground alone. Plaintiffs' attack on Dr. Geenens' credibility does not create a genuine issue of material fact. See, e.g., Eck, 256 F.3d at 1024 (credibility challenge purely speculative and "clearly insufficient" to call into question either credibility of doctor or veracity of her statement when plaintiff challenged doctor's motives and noted that doctor had previously conducted research for pharmaceutical companies); Talley, 179 F.3d at 164 (rejecting claim that learned intermediary doctrine should not apply where prescribing physician was consultant to defendant, taught surgical procedures as part of that arrangement and received annual consulting fee of $250,000, a travel budget, research funds and 25,000 stock shares; "no evidence that the consulting relationship between Dr. Matthews and Danek interfered with Dr. Matthew's independent medical judgment in treating Talley").

**109.** Geenens Deposition (Exhibit 1) in Plaintiffs' Ex., Vol. I (Doc. # 525) at 89–91.

would ignore or fail to heed a bold-faced warning about a drug?

A. I would do my absolute best to heed that type of warning.

Plaintiffs argue that Dr. Geenens' testimony does not unequivocally show what he would have done if he had a bold print black box warning in front of him at the time that he prescribed Zoloft for Matthew. To some degree, plaintiffs also argue that if Dr. Geenens had actually seen their proffered information in a package insert, rather than in the form of deposition testimony by Dr. Healy, he would have heeded that warning. As Pfizer points out, however, the "Adverse Reactions" section of the package insert contained information regarding suicidal ideation and attempts during clinical trials and Dr. Geenens clearly swore that he was aware of this information and that further warnings would not have affected his treatment decision.

When the FDA discovers special problems, particularly those that may lead to death or serious injury, it may require a drug manufacturer to place a warning about that problem in a prominently displayed box.[110] If a boxed warning is required, the FDA will specify its location.[111] The record is devoid of any evidence that the FDA would have approved a black box warning that Zoloft may cause suicide, however, and plaintiffs have not specifically argued that a black box warning was appropriate or suggested what a black box warning might say. Plaintiffs are therefore in no position to fault the "equivocal" nature of Dr. Geenens' testimony about what weight he might have afforded a hypothetical bold print black box warning. Furthermore, Dr. Geenens knew about the very risks which plaintiffs would apparently put a black box warning and they are already contained elsewhere in the package insert, in the "Precautions" and "Adverse Reactions" sections. Here, as in *Woulfe*, 965 F.Supp. at 1484, plaintiffs seem to simply argue that a jury could disbelieve the testimony of Dr. Geenens and that this possibility is sufficient to defeat an otherwise well-taken motion for summary judgment. That, however, is not the law.

In summary, plaintiffs have not raised a general issue of material fact with regard to proximate causation. Since Dr. Geenens' unequivocal testimony breaks the causal chain as to allegedly inadequate warnings, summary judgment for Pfizer is appropriate and Pfizer is entitled to summary judgment on plaintiffs' failure to warn claim.[112]

### III. Plaintiffs' Summary Judgment Motion (Doc. # 523)

Plaintiffs initially filed their motion for summary judgment on April 18, 2000, alleging that they were entitled to summary judgment on their claim that Pfizer (1) failed to adequately warn about the potential dangers of suicide associated with Zoloft and the use of Zoloft for depressed children and adolescents; and (2) failed to conduct reasonable tests and investigations regarding the potential causal relationship between Zoloft and suicide.[113] On September 14, 2001, the Court allowed plaintiffs to withdraw their summary judgment motion and gave them leave to refile it by October 1, 2001.[114] More than three weeks out of

---

110. 21 C.F.R. § 201.57(e).

111. *Id.*

112. Because the Court finds that Pfizer's first two arguments have merit, it need not address Pfizer's contentions that the warning which was in effect during July 1997 was reasonable as a matter of law and that plaintiffs do not have admissible expert testimony on the subject of warnings.

113. See Plaintiffs' Motion For Partial Summary Judgment (Doc. # 204).

114. See Minute Sheet (Doc. # 509).

time, on October 23, 2001, plaintiffs refiled their motion for summary judgment.[115] Even though the Court might strike plaintiffs' motion because it was not timely filed, the Court need not do that because the motion is both moot and lacking in merit. All of plaintiffs' arguments have been addressed elsewhere.

### IV. Motion In Limine (Doc. # 276)

Pfizer has a pending motion in limine in this matter: Defendant Pfizer Inc.'s Motion In Limine No. 15 To Exclude References To Its Financial Condition And Announced Merger (Doc. # 276) filed April 28, 2000. Because the Court has granted Pfizer's summary judgment motions on both of plaintiffs' claims, the motion in limine is overruled as moot.

IT IS THEREFORE ORDERED that Defendant Pfizer Inc's Motion For Partial Summary Judgment On Plaintiffs' Claim Of Marketing Defect And Misrepresentation (Doc. # 505) filed September 12, 2001 be and hereby is SUSTAINED.

IT IS FURTHER ORDERED that Defendant Pfizer Inc's Motion For Partial Summary Judgment On Plaintiffs' Failure To Warn Claim (Doc. # 504) filed September 12, 2001 be and hereby is SUSTAINED.

IT IS FURTHER ORDERED that Plaintiffs' Motion For Partial Summary Judgment (Doc. # 523) filed October 23, 2001 be and hereby is OVERRULED.

IT IS FURTHER ORDERED that Defendant Pfizer Inc.'s Motion In Limine No. 15 To Exclude References To Its Financial Condition And Announced Merger (Doc. # 276) filed April 28, 2000 be and hereby is OVERRULED as moot.

---

115. See Plaintiffs' Motion For Partial Summary Judgment (Doc. # 523).